853 A.2d 955 (2004)
371 N.J.Super. 449
Joan RICHARDSON, Plaintiff-Appellant,
v.
STANDARD GUARANTY INSURANCE COMPANY, Union Security Life Insurance Company, American Security Insurance Company, and CitiBank (South Dakota), N.A., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued December 16, 2003.
Decided July 22, 2004.
*960 Arnold C. Lakind, Lawrenceville, argued the cause for appellant (Szaferman, Lakind, Blumstein, Blader, Lehmann & Goldshore, attorneys; Mr. Lakind, of counsel and on the brief).
Frank Burt (Jorden Burt) of the Florida bar, admitted pro hac vice, Miami, FL, argued the cause for respondents Standard Guaranty Insurance Company, Union Security Life Insurance Company and American Security Insurance Company (Reed Smith, attorneys; Mark S. Melodia, of counsel, Princeton, and Mr. Burt and Farrokh Jhabvala, Miami, FL, on the brief).
Mark F. Horning (Steptoe & Johnson) of the Washington, D.C. bar, admitted pro hac vice, argued the cause for respondent Citibank (South Dakota) N.A. (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys, Newark; Mr. Horning, Kathleen M. Graber, Washington, DC, Brian J. McMahon and Anthony M. Gruppuso, Newark, on the brief).
Before Judges COBURN, WELLS and C.S. FISHER.
The opinion of the court was delivered by
FISHER, J.A.D.
Plaintiff filed a putative class action complaint alleging that she, and others similarly situated, were defrauded in the purchase of certain credit insurance policies marketed by a credit card issuer. This appeal requires that we consider whether the trial judge erred (1) in dismissing plaintiff's complaint through the application of the filed rate doctrine, and (2) in determining that the primary jurisdiction doctrine required that the claims be considered by state and federal administrative agencies.

*961 I
Plaintiff Joan Richardson filed a complaint, on her own behalf and on behalf of others similarly situated, in the Law Division against defendant CitiBank (South Dakota), N.A., which issued a credit card to her in 1988, and against defendants Standard Guaranty Insurance Company, Union Security Life Insurance Company, and American Security Insurance Company (the defendant insurers). Plaintiff complained that defendants' sales practices fraudulently induced her into purchasing, between 1988 and 1999, credit interruption of income policies, combined credit life and credit disability insurance policies, and a credit family leave insurance policy.
The complaint sets forth claims based on the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -116, common law fraud, fraudulent concealment, negligence (against CitiBank only), breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty (against CitiBank only); while delineated as separate causes of action, instead of demands for relief, plaintiff also sought reformation and the imposition of a constructive trust. More specifically, the complaint alleged that defendants made false, misleading, or deceptive statements, failed to disclose pertinent information, and failed to adequately explain the terms of the policies. Plaintiff also claimed that defendants sold ambiguously-worded policies, construed the policies in a manner calculated to minimize the benefits paid, paid benefits in a lesser amount than required, enrolled plaintiff in a family leave policy without her consent, improperly collected premiums after plaintiff made a claim for benefits, unfairly or inaccurately calculated premiums, and ignored cancellation notices. Plaintiff also claimed that commissions were paid to CitiBank in violation of N.J.A.C. 11:17B-2.1.
Defendants moved to dismiss, asserting the claims were barred by the filed rate doctrine or, in the alternative, the court was required to defer to state and federal agencies pursuant to the doctrine of primary jurisdiction. The trial judge granted this motion by way of a written decision. We affirm in part and reverse in part, concluding that the filed rate doctrine requires dismissal of most of the claims asserted against the defendant insurers, that the record does not presently permit a similar finding with regard to CitiBank, and that the doctrine of primary jurisdiction should not have been applied except with regard to the claims against American relating to its credit interruption policies.

II
The filed rate doctrine is a product of the deference which courts give to the ratemaking and regulatory processes of administrative bodies. The doctrine is based on the understanding that a regulated entity is "forbid[den] ... [from] charg[ing] rates for its services other than those properly filed with the appropriate federal regulatory authority." Weinberg v. Sprint Corp., 173 N.J. 233, 242, 801 A.2d 281, 286 (2002) (quoting Fax Telecommunicaciones, Inc. v. AT & T, 138 F.3d 479, 488 (2nd Cir.1998)). Stated another way, its purposes are to "preserve the regulating agency's authority to determine the reasonableness of rates" and to insure that the regulated entity "charge[s] only those rates that the agency has approved or been made aware of as the law may require." H.J. Inc. v. Northwestern Bell Tel. Co., 954 F.2d 485, 488 (8th Cir.1992), cert. denied, 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992) (citing Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577-78, 101 S.Ct. 2925, 2930-31, 69 L.Ed.2d 856, 864-65 (1981)).
As our Supreme Court's recent decisions in Weinberg and Smith v. SBC *962 Comm. Inc., 178 N.J. 265, 839 A.2d 850 (2004) demonstrate, the filed rate doctrine impacts upon claims asserted against regulated entities in two ways. First, the doctrine bars claims for monetary relief "where the damage claims are premised on state contract principles, consumer fraud, or other bases on which plaintiffs seek to enforce a rate other than the filed rate." Weinberg, supra, 173 N.J. at 243, 801 A.2d at 287. And second, claims against regulated entities may be limited or extinguished by the fact that consumers "are conclusively presumed to have constructive knowledge of the filed tariff." Id. at 242, 801 A.2d at 286 (internal quotations and citations omitted). In Smith, the Court referred to these two aspects of the filed rate doctrine as the "nondiscrimination" and "nonjusticiability" strands. 178 N.J. at 273, 839 A.2d at 855 (citing Marcus v. AT & T Corp., 138 F.3d 46, 58 (2nd Cir.1998)). Besides limiting or precluding claims for damages brought by consumers, the nondiscrimination strand has been held to bar judicial consideration of antitrust claims, Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 415-23, 106 S.Ct. 1922, 1926-30, 90 L.Ed.2d 413, 419-27 (1986), as well as a claim that one regulated entity defrauded another in reaching an agreement as to the rates each would charge, Montana-Dakota Util. Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 248, 71 S.Ct. 692, 693-94, 95 L.Ed. 912, 916 (1951). The nonjusticiability strand tends to bar consumer fraud claims in another way. While the Court in Arkansas Louisiana stated that it had "save [d] for another day the question whether the filed rate doctrine applies in the face of fraudulent conduct," 453 U.S. at 583 n. 13, 101 S.Ct. at 2933 n. 13, 69 L.Ed.2d at 867 n. 13, our Supreme Court has answered that question in the affirmative in Weinberg, supra, 173 N.J. at 244, 801 A.2d at 287-88. Accordingly, the nonjusticiability strand, as employed by the Court in Weinberg, precludes fraud claims because it operates on the presumption that the plaintiff had knowledge of the filed rates and, thus, could not reasonably rely upon the regulated entity's misrepresentations or omissions of material facts.
Plaintiff contends that the trial judge erred in applying the filed rate doctrine for numerous reasons. We disagree with plaintiff's preliminary contentions that the filed rate doctrine is a bankrupt theory which should not be expanded beyond those specific industries to which it has been applied, that it is a purely federal doctrine which has no application when the rates in question have been filed with a state regulating body, and that it is inapplicable to the insurance industry.

A
First, we acknowledge that the continued existence of the filed rate doctrine is controversial, as the majority and dissenting opinions in Weinberg demonstrate. If we were writing on a blank slate, perhaps we could be persuaded to plaintiff's view that this "century-old" doctrine, Am. Tel. and Tel. Co. v. Central Office Tel., Inc., 524 U.S. 214, 222, 118 S.Ct. 1956, 1962, 141 L.Ed.2d 222, 223 (1998), should not be permitted to override the CFA, "one of the strongest consumer protection laws in the nation," Weinberg, supra, 173 N.J. at 257, 801 A.2d at 295 (Verniero, J., dissenting), by applying a legal construct that consumers are presumed to know the content of filed rates. The troublesome effect of this doctrine has been recognized by the Supreme Court of the United States, which has said the doctrine's application "may seem harsh in some circumstances." Central Office, supra, 524 U.S. at 223, 118 S.Ct. at 1963, 141 L.Ed.2d at 233; see also Maislin Indus., U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 130-31, 110 S.Ct. 2759, 2768, 111 *963 L.Ed.2d 94, 112 (1990). More recently, three members of our own Supreme Court referred to the filed rate doctrine as "a legal fiction whose days, according to some courts, are numbered." Weinberg, supra, 173 N.J. at 255, 801 A.2d at 294 (Verniero, J., dissenting). See also Fax Telecommunicaciones, supra, 138 F.3d at 491 (The filed rate doctrine "is plainly a creature of a different time."). Despite this difference of opinion about the legitimacy of the doctrine, particularly when pitted against a consumer claim, our consideration of the scope of the filed rate doctrine comes in the wake of the Supreme Court's recent recognition of its continued existence in both its nondiscrimination and nonjusticiability strands. We thus proceed on the understanding that the doctrine maintains a substantial role in administrative ratemaking, as instructed by both Weinberg and the Court's decision in Smith earlier this year.
Second, while the filed rate doctrine has had its greatest application in barring collateral attacks on rates set by federal agencies, it has also been held to apply to rates established by state agencies. See Wegoland, Ltd. v. NYNEX Corp., 27 F.3d 17, 20 (2nd Cir.1994) ("[C]ourts have uniformly held, and we agree, that the rationales underlying the filed rate doctrine apply equally strongly to regulation by state agencies."); Taffet v. Southern Co., 967 F.2d 1483, 1494 (11th Cir.) (The doctrine "applies with equal force to preclude recovery ... [when] the rate at issue has been set by a state rate-making authority."), cert. denied, 506 U.S. 1021, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992); H.J. Inc., supra, 954 F.2d at 494 ("[T]he filed rate doctrine applies whether the rate in question is approved by a federal or state agency."). Indeed, it is noteworthy that the first application of the filed rate doctrine in this State, in 1921, involved a rate set by a state agency. Hackensack Water Co. v. Mayor, etc., of Bor. of Ridgefield, 96 N.J.L. 526, 115 A. 399 (E. & A.1921). Thus, we reject plaintiff's argument that the doctrine does not apply to state ratemaking.
Third, we also reject plaintiff's mistaken contention that the filed rate doctrine does not apply to the insurance industry not only because courts are not institutionally suited to regulate insurance premium and benefit rates, but also because of the extensive regulation of this industry. We, thus, align our decision with the considerable weight of authority from other jurisdictions that have applied the filed rate doctrine to ratemaking in the insurance industry. See Kirksey v. Am. Bankers Ins. Co. of Fla., 114 F.Supp.2d 526 (S.D.Miss.2000); Allen v. State Farm Fire & Cas. Co., 59 F.Supp.2d 1217 (S.D.Ala.1999); Morales v. Attorneys' Title Ins. Fund, Inc., 983 F.Supp. 1418 (S.D.Fla.1997); Uniforce Temp. Pers., Inc. v. Nat'l Council on Comp. Ins., Inc., 892 F.Supp. 1503 (S.D.Fla.1995), aff'd, 87 F.3d 1296 (11th Cir.1996); International Patrol & Detective Agency Co., Inc. v. Aetna Cas. & Surety Co., 419 So.2d 323 (Fla.1982); Horwitz v. Bankers Life & Cas. Co., 319 Ill.App.3d 390, 253 Ill.Dec. 468, 745 N.E.2d 591 (2001); Amundson & Assoc. Art Studio, Ltd. v. Nat'l Council on Comp. Ins., Inc., 26 Kan.App.2d 489, 988 P.2d 1208 (1999); Am. Bankers' Ins. Co. of Fla. v. Wells, 819 So.2d 1196 (Miss.2001); Byan v. Prudential Ins. Co. of Am., 242 A.D.2d 456, 662 N.Y.S.2d 44 (1997); N.C. Steel, Inc. v. Nat'l Council on Comp. Ins., 347 N.C. 627, 496 S.E.2d 369 (1998); Prentice v. Title Ins. Co. of Minn., 176 Wis.2d 714, 500 N.W.2d 658 (1993).
It is well understood that the insurance industry is "heavily regulated." Pierzga v. Ohio Cas. Group of Ins. Co., 208 N.J.Super. 40, 47, 504 A.2d 1200, 1204 (App.Div.), certif. denied, 104 N.J. 399, 517 A.2d 402 (1986); see also In re Prudential Ins. Co. *964 of Am. Sales Practices Litigation, 975 F.Supp. 584, 618 (D.N.J.1996), aff'd, 148 F.3d 283 (3rd Cir.1998). The Legislature created the Department of Banking and Insurance (DOBI) in order to "regulate and oversee the operations of the insurance industry," and placed with DOBI the general "statutory obligation to protect the interests of New Jersey's insurance consumers." N.J.S.A. 17:1C-19(a)(1). To carry out that mandate, as it pertains to credit insurance, the Commissioner of DOBI was authorized to adopt, N.J.S.A. 17B:29-1, and has adopted regulations which authorize the issuance of credit involuntary unemployment insurance in combination with credit life and disability, N.J.A.C. 11:2-3.3, require the filing of credit life and credit disability policy forms, N.J.A.C. 11:2-3.14, set standards for premium rates, N.J.A.C. 11:2-3.17, and provide for credit insurance to be issued in connection with "open end debts such as credit card transactions." N.J.A.C. 11:2-3.9.
This legislation also governs the wording as well as the cost of insurance policies by requiring that credit insurance policy forms and premium rates be filed with the Commissioner prior to use. N.J.S.A. 17B:29-7(a). The Commissioner is given sixty days to review such filings and, unless the Commissioner writes of her disapproval within that time frame, the filed rate or policy form "shall be deemed approved." N.J.S.A. 17B:29-7(g)(2). The Commissioner may approve, however, only those proposed rates that are not "excessive in relation to benefits." N.J.S.A. 17B:29-7(e)(1). The Commissioner was also given a mandate to disapprove proposed policy forms "which are unjust, unfair, inequitable, misleading, deceptive, or encourage misrepresentation of the coverage, or are contrary to any provision of this code or of any rule or regulation promulgated thereunder." N.J.S.A. 17B:29-7(e)(2). The filed rates are binding upon insurers since N.J.S.A. 17B:29-8(a) declares that "[n]o insurer shall issue any credit life insurance policy or credit health insurance policy for which the premium rate exceeds that determined by the schedules of such insurer as then on file with the [C]ommissioner." We are satisfied that the extent of the authority given to the Commissioner by this legislation demonstrates that the particular aspects of the insurance industry involved here represent a fertile ground for the application of the filed rate doctrine. To rule otherwise would invite disharmony by potentially allowing the legislatively-authorized rates fixed by DOBI to be adjusted through judicial determinations.
We additionally observe that one criticism of the filed rate doctrine has centered on the assumption that, in some industries, filed rates are not rigorously examined or challenged. See Allan Kanner, The Filed Rate Doctrine and Insurance Fraud Litigation, 76 N.D.L. Rev. 1, 16-19 (2000). In those circumstances, the regulated entity obtains a potent defense to CFA lawsuits even though its rates have arguably not been regulated. See, e.g., Brown v. Ticor Title Ins. Co., 982 F.2d 386, 394 (9th Cir.1992) ("The absence of meaningful state review allows the insurers to file any rates they want."). While, as a general matter, under-enforcement of ratemaking regulations may constitute a basis for a less rigorous application of the filed rate doctrine, we again emphasize that the statutory framework within which DOBI is expected to operate demonstrates that the area of credit insurance is highly regulated. DOBI is directed to examine such filings for their fairness and their ability to disclose terms relevant to consumers in determining whether to purchase such products. And DOBI's determinations are subject to judicial review. See N.J.S.A. 17B:29-13. Accordingly, we *965 see no cause for the concerns expressed by plaintiff that the regulations in this industry may be under-enforced and conclude that the filed rate doctrine should be applied, in the present circumstances, in the manner prescribed by Weinberg and Smith.
In so holding, we also reject plaintiff's argument that the regulations in question are different from those which bind other industries in which the filed rate doctrine is applied. Specifically, plaintiff contends that, pursuant to N.J.S.A. 17B:29-8(a), the filed rate constitutes only a maximum rate, thereby allowing insurers to vary their rates beneath that fixed ceiling. We disagree with plaintiff as to the significance of this. That the regulated entity is permitted to provide more beneficial rates to consumers in this fashion does not suggest that the Commissioner does not, in approving a maximum rate, engage in ratemaking. We conclude that this extensive governance of credit insurance presents a framework similar to those in which the filed rate doctrine has been deemed applicable.
That being said, it does not necessarily follow that all claims against such a highly regulated entity are barred by the filed rate doctrine. In Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 268, 696 A.2d 546, 553 (1997), the Court held that merely because an agency is regulated "is not dispositive in determining whether the CFA applies to a consumer practice." The Court instead declared that "a court must look to whether a `real possibility' of conflict would exist if the CFA were to apply to a particular practice." Ibid.
Plaintiff argues that Lemelledo supports the continued maintenance of her CFA claims regardless of the extensive regulation of this industry. We disagree. While Lemelledo instructs there is a presumption that the CFA applies to a covered activity, the Court also indicated that this presumption is rebuttable:
In order to overcome the presumption that the CFA applies to a covered activity, a court must be satisfied, as this Court was in Daaleman [v. Elizabethtown Gas Co., 77 N.J. 267, 390 A.2d 566 (1978)], that a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes. It must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes. We stress that the conflict must be patent and sharp, and must not simply constitute a mere possibility of incompatibility.
[Id. at 270, 696 A.2d at 554.]
When examined in light of the more recent Weinberg decision, we conclude that this presumption is overcome when the relief sought in a CFA claim would necessarily lead to a judgment which would collaterally alter the rates contained in the insurer's filings with DOBI. See H.J. Inc., supra, 954 F.2d at 489 ("[T]he focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations."). In light of this standard, a determination as to the manner in which the filed rate doctrine impacts upon plaintiff's complaint requires an examination of the asserted causes of action, to which we turn our attention.

B
In comparing the allegations of the complaint with the purposes of the filed rate doctrine, we must initially consider that the order of dismissal was based upon defendants' R. 4:6-2(e) motion. This *966 rule requires that we, like the trial judge, accept as true the complaint's factual assertions. Smith, supra, 178 N.J. at 268-69, 839 A.2d at 852-53; Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 625, 660 A.2d 505, 506 (1995). In addition, while the examination is ordinarily limited to the four corners of the complaint, perused with great liberality to determine whether a cause of action can be gleaned from even an obscure statement, see Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 746, 563 A.2d 31, 34 (1989), our Supreme Court has determined in similar circumstances that the filed rates themselves may be considered, even when not contained in the complaint and when presented only by way of the defendant's motion. See Smith, supra, 178 N.J. at 268-69, 839 A.2d at 852-53 ("Because this appeal comes to us on a Rule 4:6-2(e) motion to dismiss, we accept as true all factual assertions in the complaint[,] ... [o]ur recitation of the facts ... derives from the complaint [,][and] we consider the content of SNET's tariff filed with the Federal Communications Commission... that was submitted to the Law Division with SNET's motion to dismiss.").
In adhering to that approach, we must determine whether the complaint, when compared against the filed rates provided with the moving papers, contains any causes of action which seek an ascertainable loss, recognizing there can be no ascertainable loss if the plaintiff purchased policies which conform to the filed rates. Weinberg, supra, 173 N.J. at 243, 801 A.2d 281 ("[T]he filed rate doctrine bars money damages ... where the damage claims are premised on state contract principles, consumer fraud, or other bases on which plaintiffs seek to enforce a rate other than the filed rate."). Also, in light of the Court's recent decision in Smith, which distinguished between claims against regulated entities and claims against retailers of regulated goods or services, we consider separately the application of the filed rate doctrine to the claims asserted against CitiBank.

C
The complaint's first count, which invokes the CFA, contains allegations against the defendant insurers that fall into categories which need to be considered separately in ascertaining the impact of the filed rate doctrine, namely: (1) allegations that the defendant insurers fraudulently induced plaintiff into purchasing the policies, for which plaintiff apparently seeks rescission, (2) allegations that the cost and benefits of the policies were misrepresented, for which plaintiff seeks damages, (3) allegations that the insurers breached the terms of the insurance policies, for which plaintiff seeks damages, and (4) allegations that the policies contain or omit terms, required by DOBI regulations, or otherwise violate DOBI regulations, and seek, in addition to other remedies, an injunction that defendants "make full, accurate and adequate disclosures with regard to their Credit Insurance policies."
When the filed rate doctrine is "central to the regulatory scheme" impacted by the suit, Weinberg, supra, 173 N.J. at 241, 801 A.2d at 286, one of its consequences is the assumption that "[c]ustomers are conclusively presumed to have constructive knowledge" of the filed rate, id. at 242, 801 A.2d at 286 (citations and internal quotation marks omitted)  the nonjusticiability strand, Smith, supra, 178 N.J. at 273, 839 A.2d at 855. As a result, the filed rate doctrine precludes a consumer from complaining that he or she was induced to purchase a product or service by a regulated entity's promise to charge a price different from its filed rate, because the consumer is presumed to know the contents of the filed rate. While we recognize that fraudulent inducement to enter into a contract, *967 when the plaintiff seeks rescission of the contract, does not directly impact on the central purpose of the filed rate doctrine, see Gulf States Util. Co. v. Alabama Power Co., 824 F.2d 1465, 1472 (5th Cir.), opinion amended, 831 F.2d 557 (5th Cir.1987); Nordlicht v. New York Tel. Co., 617 F.Supp. 220, 227-28 (S.D.N.Y.1985) ("There is nothing in the policy underpinnings of the doctrine which would cause it to protect a defendant which unlawfully exacts payment, even at a lawful rate."), aff'd, 799 F.2d 859 (2nd Cir.1986), cert. denied, 479 U.S. 1055, 107 S.Ct. 929, 93 L. Ed.2d 981 (1987), our Supreme Court clearly held in Weinberg that the nonjusticiability strand of the filed rate doctrine generates a presumption of a consumer's knowledge of the filed rate which is fatal to plaintiff's fraudulent inducement claims. 173 N.J. at 244, 801 A.2d at 287 ("[P]laintiff's fraud claim is barred because the filed rate doctrine requires the conclusive presumption that plaintiff knew the filed rate."). Thus, the first category of allegations contained in the first count, insofar as they may seek rescission, were properly dismissed.
The second category of allegations  those which assert that defendants misrepresented the costs and benefits to be received from the purchase of the policies  are also barred, not only because the filed rate doctrine requires that we presume plaintiff's knowledge of the costs and benefits contained in the filed rates, but also because the doctrine requires our conclusion that plaintiff has suffered no ascertainable loss. This latter aspect is compelled by the other main consequence of the doctrine, what the Court referred to as the nondiscriminatory strand. Smith, supra, 178 N.J. at 273, 839 A.2d at 855. This strand applies in the following manner:
[T]he filed rate doctrine bars money damages ... where the damage claims are premised on state contract principles, consumer fraud, or other bases on which plaintiffs seek to enforce a rate other than the filed rate.
....
The filed rate doctrine precludes plaintiff's claim of loss under [the CFA] because he cannot recover monetary damages when he paid a rate that was consistent with defendant's approved filed tariff.
[Weinberg, supra, 173 N.J. at 243-44, 801 A.2d at 287.]
For these reasons, the CFA violations alleged in the first count, upon which plaintiff seeks damages which would be the equivalent of applying a rate different from the filed rate, were properly dismissed.
The third category of allegations contained in the first count  that the defendant insurers breached the terms of the policies she purchased  are not impacted by the filed rate doctrine. For example, plaintiff alleges that defendants misconstrued "the Monthly Benefits provision to minimize the benefits paid," failed "to make timely payments," miscalculated premiums, and ignored cancellation notices. There is nothing about the filed rate doctrine which would preclude a consumer from suing for damages on a claim that the insurer breached the policy as written. While the doctrine precludes a claim for damages which would indirectly cause the application of rates different from the filed rates, and would also preclude plaintiff from seeking relief, whether equitable or legal, for having been misled by unconscionable sales practices which caused plaintiff to enter into a contract consistent with the filed rate, the filed rate doctrine does not preclude a consumer from suing for damages by having been deprived of benefits which were promised, and were consistent with the filed rate, but were not delivered.
*968 Notwithstanding the inapplicability of the filed rate doctrine in these circumstances, the breach of an enforceable contract does not constitute a violation of the CFA. See Van Holt v. Liberty Mutual Fire Ins. Co., 163 F.3d 161, 168 (3rd Cir.1998) ("The mere denial of insurance benefits to which the plaintiffs believed they were entitled does not comprise an unconscionable commercial practice."); Kuhnel v. CNA Ins. Companies, 322 N.J.Super. 568, 582, 731 A.2d 564, 572 (App.Div.1999) ("The issues here involve the receipt of benefits, issues which have been held to be beyond the scope of the CFA."), certif. denied, 163 N.J. 12, 746 A.2d 458, cert. denied, 531 U.S. 819, 121 S.Ct. 61, 148 L.Ed.2d 27 (2000). Accordingly, while plaintiff may maintain her claim against the defendant insurers based upon their alleged breach of the terms of the policies, these allegations were properly dismissed insofar as they are claimed to constitute violations of the CFA.
The fourth category relates to plaintiff's claim that the policies' benefits and terms were inconsistent with the governing DOBI regulations. For example, plaintiff alleges the defendant insurers failed to "include the refund provisions required by N.J.A.C. 11:2-3.6(a)(5)," failed to "remit a [credit disability] premium refund as required by N.J.A.C. 11:3-20(e)," and used a credit disability insurance form "that does not conform to N.J.A.C. 11:2-39(b)(2) which requires that `periodic payment for credit, accident and health... shall not be less than the creditor's minimum repayment schedule.'" Based on these allegations, plaintiff sought an injunction which would compel the defendant insurers to "make full, accurate and adequate disclosures with regard to their Credit Insurance policies," in the first count, and seeks reformation of the policies, for the same reasons, in the second count. Also falling in this category is plaintiff's claim, set forth in the fraudulent concealment count, that the defendant insurers paid commissions to CitiBank in violation of N.J.A.C. 11:17B-2.1. We conclude that these claims are not subject to dismissal pursuant to the filed rate doctrine. Rather than conflict with the doctrine, these alternative claims actually assume the application of the filed rate and filed policy terms, and seek enforcement due to the defendant insurers' alleged failure to abide by DOBI regulations.
The other counts of the complaint asserted against the defendant insurers, which allege common law fraud, fraudulent concealment, grounds for the imposition of a constructive trust, and breach of the covenant of good faith and fair dealing, are precluded by the filed rate doctrine in the same way, since they essentially rephrase the consumer fraud allegations which we have determined to be barred by the filed rate doctrine. There are, however, apart from these generalities, two specific claims contained in these counts of the complaint which should not have been dismissed.
First, the complaint alleges that plaintiff was sold a family leave insurance policy in March 1999 to which she did not consent. Unlike the fraudulent inducement claims discussed earlier and found barred by the filed rate doctrine, this fraud claim has no conceivable bearing on DOBI's ratemaking authority and is not impacted by the nonjusticiability strand because plaintiff's presumed knowledge of the filed rates is irrelevant to her claim that she was sold this policy without her knowledge or consent. See Brown v. MCI WorldCom Network Servs., Inc., 277 F.3d 1166, 1171-72 (9th Cir.2002). Second, plaintiff's claims against American with regard to the credit interruption policies it issued cannot be barred by the filed rate doctrine since the defendant insurers did not demonstrate, in moving for dismissal, *969 the existence of a filed rate for these policies. It would be illogical to apply the filed rate doctrine to a contract which is not based on a filed rate. See Florida Mun. Power Agency v. Florida Power & Light Co., 64 F.3d 614, 616-17 (11th Cir.1995); Union Ink Co., Inc. v. AT & T Corp., 352 N.J.Super. 617, 642, 801 A.2d 361, 377 (App.Div.2002). In that circumstance, it cannot be presumed that the consumer had knowledge of the rate, and the award of damages could not conflict with the rate, because no rate had been filed.

D
Plaintiff's claims against CitiBank must be viewed differently since CitiBank is not an insurer and filed no rate regarding these policies. Instead, CitiBank appears to have only marketed and sold the policies to plaintiff, its cardholder. As a result, the claims against CitiBank must be examined in light of Smith, supra, 178 N.J. 265, 839 A.2d 850.
Smith considered the impact of the filed rate doctrine on unregulated retailers or sellers, drawing a distinction between those retailers or sellers who are agents of the regulated entity and those who act independently. The Court expressed concerns about lifting the impact of the filed rate doctrine when the goods or services are sold by a non-regulated entity which is in an agency relationship with a regulated entity:
Unless the filed rate doctrine is "rigidly enforced" when a non-carrier is an agent for a carrier, a carrier could devise a scheme allowing it to circumvent the tariff rates through the use of an agent. More specifically, as the Second Circuit has noted, carriers, through their agents, "might intentionally `misquote' rates to certain customers...." As the Supreme Court has observed, "agents of carriers might easily become experts in the making of errors and mistakes in the quotation of rates to favored [customers], while other [customers] ... whose [business] is less important, would be compelled to pay the higher published rates." In those circumstances, the agent, even if otherwise culpable under state law for fraud or breach of contract, cannot be held liable for damages because the net effect of imposing any monetary sanction on the agent would be to effectuate a rebate for the services provided by the carrier, thereby resulting in discrimination between ratepayers.
[178 N.J. at 277-78, 839 A.2d at 858 (citations and internal quotations marks omitted).]
On the other hand, the Smith Court held that these concerns evaporate when a non-regulated retailer or seller acts independently from the regulated entity:
Th[e] [agency] scenario can be readily distinguished from the situation in which a retailer, acting with complete independence from the telecommunications carrier, buys from a reseller or issuer telecommunications services that were purchased previously from a carrier in accordance with the terms and conditions of a filed tariff. In that circumstance, a suit brought by the end-user against the retailer alleging fraud or breach of contract arising out of the resale of those services implicates neither of the filed rate doctrine's cardinal principles.
[Id. at 278, 839 A.2d at 858.]
The record on appeal is limited because of the stage at which the case was dismissed. Consequently, the record provides little information by which the relationship between the defendant insurers and CitiBank may be assessed or defined. Depending upon the circumstances outlined in Smith, holding CitiBank liable for damages arising from its separate contractual *970 relationship with plaintiff does not necessarily implicate the filed rate doctrine. Further investigation and discovery will undoubtedly be required to shed sufficient light on that question before the application of the filed rate doctrine to CitiBank's actions can be ascertained. In any event, at this stage of the litigation, it cannot be said that the claims against CitiBank are barred, in whole or in part, by the filed rate doctrine.

E
To summarize, we affirm the dismissal, based upon the filed rate doctrine, of all plaintiff's claims against the defendant insurers except the following, as to which we reverse: (1) the breach of contract allegations which appear in the consumer fraud count (although they do not state a claim upon which CFA relief may be granted, those allegations do state a claim upon which common law contractual relief may be granted), (2) the claim that the defendant insurers failed to comply with state regulations, (3) the claims against American with regard to the credit insurance policies, since no filed rate was provided in support of the motion to dismiss, (4) the claim that a family leave policy was sold to plaintiff in March 1999 without her consent, and (5) all claims against CitiBank, since the record inadequately demonstrates how Smith's holding should be applied.

III
Having determined that the filed rate doctrine does not bar all of plaintiff's claims, we must consider whether the doctrine of primary jurisdiction requires that any surviving claims be pursued at an administrative level. The trial judge's ruling that the doctrine of primary jurisdiction required dismissal of the complaint is not owed our deference. Muise v. GPU, Inc., 332 N.J.Super. 140, 157, 753 A.2d 116, 125 (App.Div.2000). With the exception of the referral to DOBI of plaintiff's claims against American regarding the credit insurance policies for which no rate was filed, we reject the trial judge's application of the doctrine of primary jurisdiction.

A
We initially observe that the judge's view of the filed rate and primary jurisdiction doctrines as setting forth alternative bases for dismissal is mistaken. The filed rate doctrine disposes of claims to which it applies, while the doctrine of primary jurisdiction directs that an actionable claim ought to be pursued elsewhere. This distinction is important because there may ultimately be a need in such circumstances for a court to reacquire jurisdiction of a claim which it referred to an administrative body, in order to afford a plaintiff complete relief. Indeed, in these circumstances, the need to reacquire jurisdiction is very real, since we see nothing in the statutes or DOBI regulations to suggest that DOBI has the power to issue the extensive relief authorized by the CFA. Cf. Sheeran v. Progressive Life Ins. Co., 182 N.J.Super. 237, 250, 440 A.2d 469, 475 (App.Div.1981). Because administrative agencies are unlikely to possess the authority to issue relief coextensive with the authority provided by the CFA to courts of competent jurisdiction, the primary jurisdiction doctrine in such instances does not warrant dismissal but only a stay of the proceedings pending the agency's determination. Boldt v. Correspondence Mgmt., Inc., 320 N.J.Super. 74, 89, 726 A.2d 975, 983 (App.Div.1999). Accordingly, we reject the trial judge's determination that the doctrine of primary jurisdiction required dismissal of any aspect of the complaint.
The primary jurisdiction doctrine "is defined as the circumstance in which `a court declines original jurisdiction *971 and refers to the appropriate body those issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.'" Muise, supra, 332 N.J.Super. at 158, 753 A.2d at 126 (quoting Daaleman, supra, 77 N.J. at 269 n. 1, 390 A.2d at 568 n. 1). It has two essential purposes, the first of which is "to allow an agency to apply its expertise to questions which require interpretation of its regulations," and the second of which is "to preserve uniformity in the interpretation and application of an agency's regulations." Muise, supra, 332 N.J.Super. at 159-60, 753 A.2d at 126. Courts should defer to an agency's jurisdiction "only if `to deny the agency's power to resolve the issues in question' would be inconsistent with the `statutory scheme' which vested the agency `with the authority to regulate [the] industry or activity' it oversees." Id. at 160, 753 A.2d at 127 (quoting United States ex rel. Haskins v. Omega Inst., Inc., 11 F.Supp.2d 555, 561 (D.N.J.1998)). In determining whether the primary jurisdiction doctrine should apply, four factors must be weighed:
1) whether the matter at issue is within the conventional experience of judges; 2) whether the matter is peculiarly within the agency's discretion, or requires agency expertise; 3) whether inconsistent rulings might pose the danger of disrupting the statutory scheme; and 4) whether prior application has been made to the agency.
[Boldt, supra, 320 N.J.Super. at 85, 726 A.2d at 981.]
The claims asserted against the defendant insurers which have survived the application of the filed rate doctrine, and the claims asserted against CitiBank, all of which have survived, must be examined against these principles of primary jurisdiction in order to determine whether the trial judge should have referred any claims to an appropriate agency. The defendant insurers argue that primary jurisdiction requires that any remaining claims against them should be heard by DOBI, and CitiBank argues that any remaining claims against it should be heard by the Office of the Comptroller of the Currency (OCC).

B
As indicated earlier, the claims which remain against the defendant insurers, after application of the filed rate doctrine, consist of (1) the alleged failure of the insurers to comply with the terms of the insurance contracts, (2) the alleged failure of the insurers to comply with insurance regulations, (3) American's alleged fraudulent conduct, including violations of the CFA, with regard to the credit interruption policies as to which there is no filed rate, and (4) the enrollment of plaintiff in a family leave policy allegedly without her consent. In applying the principles of primary jurisdiction, we conclude that plaintiff's claims against American regarding the credit interruption policies should be referred to DOBI, but reject the contention that the primary jurisdiction doctrine requires a referral of any other claim.
While the claims asserted against American regarding its credit insurance policies are within the "conventional experience of judges," the actions of insurers in marketing their policies, the fairness of the content of their policies, and the rates charged, are matters falling well within the realm of DOBI's experience and expertise. There is also a potential for inconsistent rulings which may tend to disrupt the regulatory scheme in which DOBI is engaged (even though these policies have not been subjected to that scheme due to the lack of a filed rate). We have also been informed that plaintiff has filed a claim with DOBI. These circumstances demonstrate to our satisfaction that the claims against American, which would have been dismissed but *972 for the absence of a filed rate, should be first pursued in DOBI.
We reject, however, the argument that the claims which survived the application of the filed rate doctrine, i.e., the breach of contract claims, the failure to comply with DOBI's regulations, and the alleged fraudulent enrollment of plaintiff in a family leave policy, should be referred to DOBI. As for the breach of contract claims, we do not understand the defendant insurers to claim that DOBI has jurisdiction, or a peculiar expertise, to determine whether an insurer has failed to comply with an insurance policy. Our courts routinely determine whether insurance policies have been breached and there is no regulatory scheme which would be impacted by a judicial determination of a breach of an insurance contract which otherwise conforms to insurance regulations. The same can be said for plaintiff's claim regarding the family leave policy. In addition, adjudication of the claims which seek enforcement of state insurance regulations would not interfere with DOBI's expertise or regulatory schemes. In determining whether the policies in question conform to state regulation, the court would be obligated to apply those standards and, thus, would be acting consistently with the regulatory authority of DOBI.

C
In applying the primary jurisdiction principles discussed above, we also conclude that the trial judge erred in finding a need to refer the claims against CitiBank to OCC.
The parties do not dispute that CitiBank is a national bank regulated by OCC. 12 U.S.C.A. §§ 1, 21-27, 481; Nat'l State Bank, Elizabeth, N.J. v. Long, 630 F.2d 981, 988-89 (3rd Cir.1980). It is also true that OCC permits national banks to provide credit insurance to their loan customers, subject to certain restrictions. See 12 C.F.R. §§ 12.1 to 12.5. CitiBank's marketing activities in the credit insurance field are governed by the Truth in Lending Act (TILA), 15 U.S.C.A. §§ 1601 to 1681. TILA has determined that premiums for credit insurance are considered "finance charges," except under specified circumstances. See 15 U.S.C.A. § 1605(a); 12 C.F.R. § 226.4(b) and (d). For example, a credit insurance premium is not a finance charge if the insurance coverage is not a factor in the creditor's approval of the extension of credit, and this fact is clearly disclosed in writing to the person applying for credit; also, to obtain insurance in connection with the extension of credit, the person applying must give written indication of his desire to do so, after written disclosure of the cost. 15 U.S.C.A. § 1605(b)(2); 12 C.F.R. § 226.4(d). TILA also provides for certain mandatory disclosures by credit card issuers in connection with their offering of credit insurance. 15 U.S.C.A. § 1637(g); 12 C.F.R. § 226.9(f).
While the Board of Governors of the Federal Reserve System is responsible for promulgating regulations under TILA, 15 U.S.C.A. § 1604(a), which it has fulfilled by adopting Regulation Z, 12 C.F.R. § 226.1 to 226.28, the OCC is responsible for enforcing compliance with TILA with respect to national banks such as CitiBank. 15 U.S.C.A. § 1607(a)(1)(A). TILA provides that where OCC determines that a finance charge was inaccurately disclosed to a creditor, OCC is authorized "to require the creditor to make an adjustment to the account of the person to whom credit was extended," as prescribed by law. 15 U.S.C.A. § 1607(e)(1). TILA imposes sanctions for such violations. 15 U.S.C.A. § 1611. TILA also creates a private right of action for aggrieved debtors, which may be asserted in any court of competent jurisdiction. 15 U.S.C.A. *973 § 1640(e). Thus, TILA does not vest exclusive jurisdiction to enforce its provisions in any federal agency. See Ratner v. Chem. Bank N.Y. Trust Co., 309 F.Supp. 983, 985-89 (S.D.N.Y.1969).
In addition, TILA does not preempt state law except to the extent that state law is inconsistent with its terms. 15 U.S.C.A. § 1610(a)(1); 12 C.F.R. § 226.28(a); Alexiou v. Brad Benson Mitsubishi, 127 F.Supp.2d 557, 559-65 (D.N.J.2000); McCrae v. Commercial Credit Corp., 892 F.Supp. 1385, 1386-87 (M.D.Ala.1995); Gen. Elec. Capital Auto Lease, Inc. v. Mires, 788 F.Supp. 948, 950 (E.D.Mich.1992). New Jersey law mirrors TILA, and expresses an intent not to conflict with TILA by indicating that New Jersey law will not be enforced to the extent inconsistent with TILA, N.J.S.A. 17:3B-1, and to the extent both TILA and New Jersey law prohibit a certain act, and TILA provides for lesser remedies than does New Jersey law, a plaintiff will be limited to the remedies available under TILA, N.J.S.A. 17:3B-2.
Given this statutory and regulatory framework, we conclude that the weighing of the four factors described in Boldt, supra, 320 N.J.Super. at 85, 726 A.2d at 981, leads to a determination that deference should not be given to OCC under the doctrine of primary jurisdiction. First, it is well within the conventional experience of judges to address consumer fraud issues. By creating a private right of action, TILA anticipated judicial involvement in its interpretation and the interpretation of its implementing regulations, and assumes the judiciary's competence to do so. 15 U.S.C.A. § 1640. Second, interpretation and enforcement of TILA is not peculiarly within OCC's discretion and does not require its expertise. See Minnesota ex rel. Hatch v. Fleet Mortgage Corp., 158 F.Supp.2d 962, 966 (D.Minn.2001). Considering that OCC is not the sole agency responsible for enforcing TILA  eight other federal agencies also possess that responsibility, 15 U.S.C.A. § 1607(a)  also strongly suggests there is no need to defer to OCC in this matter. This diversity of responsibility for enforcement of TILA also compels a determination that the third primary jurisdiction factor, the risk of inconsistent rulings which would jeopardize a uniform statutory or regulatory scheme, has not been met here. The fourth factor also weighs against deferring to OCC, since the record on appeal does not indicate the existence of a pending OCC claim; indeed, CitiBank has not referred to any statute or regulation which would support its argument that OCC has a mechanism for hearing claims of TILA violations.[1]

D
Having determined that the claims against American regarding its credit interruption policies, for which there is no filed rate, are matters which should be referred to DOBI, but the remaining claims may be maintained in the trial court, the question remains how the case should be forthwith managed. Considering the limited record created by the motion to dismiss, we share the regret expressed by Judge King, in similar circumstances, "that the matter at the moment is too abstract and novel for us to provide the judge with any more precise guidance." Muise, supra, 332 N.J.Super. at 166, 753 A.2d at 130. With little information *974 by which we could determine whether the claims to be referred to DOBI should proceed first, or await the completion of some or all of the claims which will remain in the trial court, or whether all claims may proceed simultaneously, we leave the further management of these claims to the trial judge's sound discretion.

IV
For these reasons, we affirm the dismissal of all claims against the defendant insurers based on the filed rate doctrine, except we reverse the dismissal of (1) the claims against all defendant insurers which allege they breached the policies issued to plaintiff in any of the ways alleged by plaintiff in paragraphs 4(a), (b), (e), (g), (h), (i), (q), (r), (s), and (t) of the first count of her complaint, (2) the claims against all defendant insurers which allege they failed to comply with DOBI regulations, as alleged by plaintiff in paragraphs 4(l), (m), (n), (o), and (p) of the first count and paragraph 3 of the second count of her complaint, including the claim that CitiBank was paid commissions in violation of N.J.A.C. 11:17B-2.1, (3) the claim that plaintiff was enrolled in a family leave policy without her consent, and (4) the claims against American regarding its credit interruption policies.
We affirm the trial judge's determination regarding the application of the primary jurisdiction doctrine only with respect to the referral to DOBI of the claims against American regarding its credit insurance interruption policy. This results in there being cognizable claims in both the trial court and in DOBI. We leave the management of these claims to the trial judge's discretion.
We reverse the dismissal of the claims against CitiBank in all respects, since the record does not presently support the application of the filed rate doctrine to any of those claims, but we do not foreclose any further consideration of the application of the filed rate doctrine to the claims against CitiBank in light of Smith, supra, 178 N.J. 265, 839 A.2d 850. We also reverse the trial judge's determination that the doctrine of primary jurisdiction requires referral of the claims against CitiBank to OCC.
NOTES
[1] We observe that a creditor, state, or other interested party may petition the Secretary of the Board of Governors of the Federal Reserve System to determine whether a state law is inconsistent with TILA, see 12 C.F.R. § 226.28(a)(1), but this does not suggest that the Board of Governors or the OCC is prepared to consider consumer complaints asserting TILA violations.