**Luis R. RIOS, and Liovigilda R. Rios, et al., Plaintiffs,**

v.

**STATE FARM FIRE AND CASUALTY COMPANY, Defendant.**

No. 3:05–cv–00146.

United States District Court, S.D. Iowa, Davenport Division.

Jan. 9, 2007.

---

Barbara C. Frankland, Rex A. Sharp, Gunderson, Sharp, Walke LLP, Prairie Village, KS, Jason D. Walke, Joseph R. Gunderson, David K. Basler, Gunderson, Sharp, Walke LLP, Des Moines, IA, Jeffrey S. Bittner, Bittner Law Office PC, Davenport, IA, for Plaintiffs.

James P. Gaughan, Joseph A. Cancila, Jr, Lawrence H. Heftman, Schiff Hardin & Waite, Chicago, IL, J. Michael Weston, Moyer & Bergman, PLC, Cedar Rapids, IA, for Defendant.

ORDER ON DEFENDANT'S COMBINED MOTION FOR JUDGMENT ON THE PLEADINGS ON PLAINTIFFS' CLAIMS FOR PREMIUM DAMAGES AND MOTION TO STRIKE AND DISMISS PLAINTIFFS' NATIONWIDE CLASS ALLEGATIONS

PRATT, Chief Judge.

Before the Court is Defendant, State Farm Fire and Casualty Company's ("State Farm") Combined Motion for Judgment on the Pleadings on Plaintiffs' Claims for Premium Damages and Motion to Strike and Dismiss Plaintiffs' Nationwide Class Allegations ("Combined Motion"), filed on March 10, 2006 (Clerk's No. 43). Instead of filing a Resistance, Plaintiffs, Luis R. Rios[1] et al. ("Plaintiffs") responded to State Farm's Combined Motion by filing a Motion to Stay (or Deny Without Prejudice) State Farm's Partial Motions to Dismiss and for Certain Alternative Relief ("Motion to Stay") on May 12, 2006.[2] Clerk's No. 58. State Farm filed a Reply in support of its Combined

---

1. The case was previously captioned *Jeffrey Varboncoeur, et al. v. State Farm Fire and Casualty Company*. However, after some discovery, Plaintiffs' attorneys realized that the policy at issue did not apply to Mr. and Mrs. Varboncoeur's homeowner's policy. Pls.' Mot. to Amend to File Third Amend and Substituted Class Action Complaint ("Mot. to Amend") at 3–4. The Varboncoeurs, with authorization, were dropped as class representative and eliminated from the lawsuit. *Id.* at 4. Despite the actual caption that certain pleadings were filed under, for clarity and consistency, the Court will hereinafter refer to Louis R. Rios et al. as Plaintiffs.

2. Plaintiffs' Motion to Stay was denied on September 1, 2006. Clerk's No. 126.

Motion (Clerk's No. 80) due to the contents of Plaintiffs' Motion to Stay concerning State Farm's Combined Motion. *See* Clerk's No. 165 (State Farm's Surreply Ex. A). Plaintiffs subsequently filed their Resistance on October 4, 2006 (Clerk's No. 141), and State Farm filed its Surreply on November 16, 2006 (Clerk's No. 165). The matter is fully submitted. For the reasons discussed below, the motion is GRANTED in part and DENIED in part.

## I. PROCEDURAL AND FACTUAL BACKGROUND

Plaintiffs' case is before the Court for the third time. Plaintiffs initially filed a Class Action Petition in the Iowa District Court in and for Scott County on August 27, 2004. State Farm removed the case to federal court on the basis of diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332(a). The Court remanded the case back to state court for lack of jurisdiction because State Farm failed to demonstrate that the amount in controversy met the $75,000.00 statutory minimum. *See Varboncoeur v. State Farm Fire & Cas. Co.*, 356 F.Supp.2d 935 (S.D.Iowa 2005). Subsequently, Plaintiffs filed a Motion to Amend their petition in state court. In their original petition, Plaintiffs limited class membership to citizens of Iowa, while the amended petition proposed to open class membership to affected individuals nationwide. Before the state court ruled on Plaintiffs' Motion to Amend, State Farm removed the case to federal court pursuant to the Class Action Fairness Act of 2005 ("CAFA"), codified in pertinent part at 28 U.S.C. § 1332(d). The Court then remanded the case, for a second time, back to state court. The Court explained that, because the state court did not rule on Plaintiffs' Motion to Amend, the Court lacked jurisdiction to entertain the amended petition. *See Varboncoeur v. State Farm Fire & Cas. Co.*, No. 3:05–cv–00095, slip op. at 5–8 (S.D.Iowa Oct. 13, 2005). After the state court granted Plaintiffs' Motion to Amend, State Farm removed this case for the third and final time pursuant to § 1332(d) on December 8, 2005. Clerk's No. 1.

In their Third Amended Complaint,[3] Plaintiffs, "for their individual claims as well as in the form of a representative action," allege fraudulent inducement/rescission, unjust enrichment, and breach of contract. Third Am. Compl. ¶¶ 38–55. Plaintiffs allege that, on or about 1996 through 2000 or early 2001, State Farm offered a "standard" homeowner's insurance policy for roof repairs. *Id.* ¶ 12. Under the standard policy, State Farm would pay policyholders the cost of roof repairs in two parts. State Farm would first pay the policyholder the cost of a roof "overlay"[4] (less depreciation) upfront, and then

---

3. The present motion was initially filed based on Plaintiffs' Second Amended and Substituted Class Action Complaint. Clerk's No. 43. While the motion was still pending, Plaintiffs filed a Motion to Amend to File Third Amended and Substituted Class Action Complaint, which was granted. Clerk's Nos. 143, 169. Therefore, the Court will substitute Plaintiffs' Second Amended Complaint with their Third Amended Complaint for the purposes of this instant motion. It should be noted that Plaintiffs filed a Motion to Amend to File Fourth Amended and Substituted Class Action Complaint. Clerk's No. 163. However, all briefing regarding Plaintiffs' Motion to Amend and File Fourth Amended and Substituted Class Action Complaint has been stayed pending the outcome of the present motion. Clerk's No. 168.

4. It appears that a roof overlay consists of laying new shingles on top of the original shingles, essentially adding another layer of shingles to the roof. *See* Third Am. Compl. ¶ 12.

pay the cost of a roof "tear-off"[5] (plus depreciation) as a reimbursement once the policyholder completed the roof repair/replacement, and sought reimbursement for such repairs. *Id.* For example, if a policyholder incurred roof damage that was covered under the policy, and the total replacement cost of the roof damage was $3,000.00,[6] then under the standard policy, State Farm would only pay the policyholder the cost to overlay the roof (hypothetically $1,800.00) upfront, and withhold the rest of the replacement cost (hypothetically $1,200.00), i.e., tear-off costs plus depreciation,[7] until actual repairs were made on the roof. Thus, State Farm would pay the policyholder $1,800.00 as the overlay payment upfront (payment to lay new roof shingles on top of the existing roof shingles), and pay the remaining $1,200.00 as tear-off costs (the cost to tear off the damaged roof shingles to install a new single layer of roof shingles) only after the policyholder completed the roof repairs/replacements and sought reimbursement from State Farm. If the policyholder did not make the tear-off repairs within the two-year time period provided under the policy, then State Farm would not have to pay the $1,200.00 tear-off costs to the policyholder. *See id.* Thus, under State Farm's two part payment ("holdback") system, a policyholder would recover the full value of the total roof replacement costs ($3,000.00) only if the policyholder initially incurred the tear-off costs ($1,200.00) to complete the repairs within two-years, and then sought reimbursement for the repairs. *See id.* Otherwise, the policyholder would only be paid for the

overlay costs ($1,800.00). *See id.* Apparently, this type of holdback claim practice for roof repairs is typical in the insurance industry. *See id.* Some states, however, apparently do not allow such holdback claim practice and require insurers to pay the total replacement costs ($3,000.00) upfront. *See id* ¶¶ 2 n. 1, 12–13.

On or about 2000, State Farm evaluated their "experience" in states where it offered total replacement coverage upfront as required by state laws, and determined that offering upfront total replacement cost coverage for roof repairs for all policyholders would yield a significant marketing opportunity. *Id.* ¶ 13. In essence, State Farm would no longer pay the overlay cost ($1,800.00) upfront and monitor the policyholder's repair process to reimburse the tear-off costs ($1,200.00) if the repairs were completed within two-years, but rather, State Farm would pay the total replacement costs of the roof repair ($3,000.00) upfront. State Farm, in effect, would have been the first major insurance company to offer upfront total replacement cost coverage nationwide. *Id.* State Farm concluded that agents could easily market the "upfront" policies, gain customer satisfaction, and save money by not having to monitor the often lengthy repair/replacement process for each insured with a roof damage claim. *Id.* State Farm believed that the benefits of marketing and implementing the "upfront" coverage outweighed the risks presented by any increased loss payments paid upfront. *Id.* Thus, in 2000 and early 2001, State Farm gained the approval of state regulators,

---

**5.** It appears that a roof tear-off consists of tearing off the original shingles and installing a new single layer of shingles on the roof. *See* Third Am. Compl. ¶ 12.

**6.** Total replacement cost value of roof claims were often in the range of $3,000.00 to $5,000.00. Third Am. Compl. ¶ 12.

**7.** The tear-off costs are estimated to be 25% to 40% of the total replacement value. Third Am. Compl. ¶ 12.

where required, and introduced upfront coverage for roof repairs ("Upfront Endorsement") nationwide. *See id.*

Unfortunately, State Farm experienced historic pay-out losses in 2001 and 2002. *Id.* ¶ 14. In 2001 alone, State Farm paid out approximately $115 million more in replacement cost claims than in previous years due to the Upfront Endorsement policies. *Id.* ¶ 15. In response, State Farm stopped selling Upfront Endorsement policies to new policyholders in some states, and took immediate steps to withdraw the Upfront Endorsement policies where feasible. *Id.* ¶ 16. However, State Farm was contractually bound to existing policyholders to provide the Upfront Endorsement for a year or more, depending on the life of the homeowner's policy and applicable renewal dates. *Id.* ¶ 17. Moreover, in many states, State Farm was required to obtain approval from state regulators to withdraw the Upfront Endorsement policies. *Id.* Instead of seeking regulatory approval to withdraw the Upfront Endorsement policies, according to Plaintiffs, State Farm continued to sell Upfront Endorsement policies, while never intending to honor the contracts, and fraudulently reverted to the holdback claim practice, i.e., the two part payment system. *Id.*

Specifically, in the summer of 2002, State Farm stopped paying the total replacement cost of roof repairs upfront and implemented the holdback claim practice in Wisconsin, North Dakota, South Dakota, Nebraska, Iowa, and Minnesota. *Id.* ¶¶ 3 n. 3, 18. That is, instead of paying for the total replacement cost of the roof damage ($3,000.00 from the hypothetical above) upfront pursuant to the terms of the Up-

front Endorsement policy, State Farm reverted to the two part payment system and only paid for the overlay costs, less depreciation ($1,800.00) upfront and only reimbursed the policyholder for the tear-off costs, plus depreciation ($1,200.00) if the policyholder completed the repairs within two-years and sought reimbursement for such repairs. By reverting to the holdback claim practice, State Farm intended to save money on those policyholders that would not complete the necessary tear-off repairs to collect the holdback monies ($1,200.00), and to accrue interest on holdback monies for policyholders who did complete the necessary tear-off repairs by delaying their payment. *Id.* ¶ 18. According to Plaintiffs, State Farm "perpetrated this fraud on its policyholders from 2001 through 2004, effectively absconding with potentially over $100 Million Dollars per year from its Upfront Endorsement policyholders, before acquiring regulatory approval to change the policy language back to the standard policy" with its two part payment system. *Id.* ¶ 19.

Plaintiffs identify two classes, the Rescission Class (Class I) and the Roof Claim Class (Class II). *Id.* ¶¶ 21, 22. Class I would be composed of all State Farm homeowners' policyholders in the forty-five [8] states who: (1) purchased Upfront Endorsement; and (2) who did not have a first party claim under the Upfront Endorsement. *Id.* ¶ 28. Class II would be composed of all State Farm homeowners' policyholders in the forty-five states who: (1) purchased the Upfront Endorsement; (2) who did have a first party covered roof claim under the Upfront Endorsement; (3) whose claim loss was adjusted with some amount of the loss allocated to roof tear-off

---

**8.** As previously noted, certain states require insurers to pay replacement costs upfront by law, while some state regulators did not approve State Farm's Upfront Endorsement in

the first instance. Thus, the proposed class action lawsuit would not apply to policyholders in such states. *See* Third Am. Compl. ¶ 2 n. 1; Pls.' Mot. to Amend at 9.

as a payable when incurred ("PWI") allocation; and (4) were not fully paid the amount of the loss allocated to roof tear-off upfront. *Id.* Under the theory of fraudulent inducement/rescission, Plaintiffs and Class I seek "rescission and disgorgement of all they paid to State Farm for the Upfront Endorsement [p]olicy, plus interest paid...." *Id.* ¶ 55. Under the theories of breach of contract and unjust enrichment, Plaintiffs and Class II seek "lost interest for delayed payment of 'PWI' or for non-payment of 'PWI,' plus interest...." *See id.* ¶¶ 42, 47.

## II. APPLICABLE STANDARDS

■ Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed. R. Civ. P 12(c). Judgment on the pleadings "is appropriate when the moving party has clearly established no material issue of fact remains and that it is entitled to judgment as a matter of law." *Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.,* 384 F.Supp.2d 1334, 1351 (S.D.Iowa 2005). Under this strict standard, the Court must accept all factual allegations set out in the complaint as true, and must construe the complaint in the light most favorable to the plaintiffs, drawing all inferences in their favor. *Wishnatsky v. Rovner,* 433 F.3d 608, 610 (8th Cir.2006). When considering a motion for judgment on the pleadings, a court must generally consider only those materials in the pleadings. *Kemin Foods,* 384 F.Supp.2d at 1352. The court may, however, consider materials that are part of the public record and that do not contradict the pleadings, as well as those materials that are necessarily embraced by the pleadings. *Id.*

■ Rule 12(f) provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). However, because striking a party's pleadings is an extreme measure, the Eighth Circuit has stated that motions to strike "are viewed with disfavor and are infrequently granted." *Stanbury Law Firm, P.A. v. Internal Revenue Serv.,* 221 F.3d 1059, 1063 (8th Cir.2000) (quoting *Lunsford v. U.S.,* 570 F.2d 221, 229 (8th Cir.1977)). Nevertheless, a motion to strike should be granted if "it may have the effect of making the trial of the action less complicated, or [it] may have the effect of otherwise streamlining the ultimate resolution of the action." *U.S. v. Dico, Inc.,* 189 F.R.D. 536, 541 (S.D.Iowa 1999) (internal citation omitted).

## III. LAW AND ANALYSIS

State Farm argues that Plaintiffs' claims for premium damages are barred by the filed rate doctrine and that Plaintiffs' nationwide class allegations must be stricken and dismissed because the Third Amended Complaint fails to satisfy the requirements set forth in Rule 23(a) and (b) as a matter of law. In response, Plaintiffs contend that claims for premium damages are not barred by the filed rate doctrine because the Court cannot assume that "Iowa (or other states where State Farm does business) would apply the filed-rate doctrine to insurance," and even if the filed rate doctrine applied in the insurance context, Plaintiffs' claims for premium damages do not conflict with the filed rate doctrine. *See* Pls.' Opp'n to Def.'s Combined Mot. ("Pls.' Opp'n") at 16. Plaintiffs further argue that State Farm's motion to strike and dismiss Plaintiffs' nationwide class allegations is premature, as class discovery has not yet been completed, and improper, as the Court would be ruling on a class issue without a rigorous analysis of Rule

23 factors, including a choice of law analysis. Because State Farm has filed a Combined Motion on two separate and distinct issues, the Court will first address whether the filed rate doctrine bars Plaintiffs' claims for premium damages, and then address whether Plaintiffs' nationwide class action allegations must be stricken and dismissed.

### A. *Filed Rate Doctrine*

▄▄▄ The filed rate doctrine precludes plaintiffs from challenging rates charged by a regulated entity when those rates have been properly filed with a regulatory agency. *See AT & T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998). The filed rate doctrine has its roots in the U.S. Supreme Court cases decided under the Interstate Commerce Act, but has since "been extended across the spectrum of regulated utilities." *See Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). In *Keogh v. Chicago Northwestern Railway Company*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), a private shipper alleged that the rates filed with, and approved by, the Interstate Commerce Commission ("ICC") had been fixed by conspiracy, and as a result, the rates "were higher than [what] the rates would have been if competition had not been thus eliminated." *Keogh*, 260 U.S. at 160, 43 S.Ct. 47. The plaintiff sought the difference between the higher conspiracy rates and what the rates would have been but for the conspiracy, i.e., prevailing rates before the conspiracy. *Id.* The Supreme Court stated that the plaintiff could not recover damages because paying the rates approved by the ICC conclusively established that the charged rates were "reasonable and nondiscriminatory." *Id.* at 161, 43 S.Ct. 47. Thus, in its classic form, the filed rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal [or state] regulatory authority." *Ark. La. Gas Co.*, 453 U.S. at 577, 101 S.Ct. 2925; *H.J. Inc. v. N.W. Bell Tel. Co.*, 954 F.2d 485, 494 (8th Cir.1992) (stating "the filed rate doctrine applies whether the rate in question is approved by federal or state agency"). Thus, under the filed rate doctrine, a regulated entity may not charge rates which are different than the rate filed, *see Archer Daniels Midland Co. v. Iowa*, 485 N.W.2d 465, 467 (Iowa 1992), nor may plaintiffs challenge rates properly filed with a regulatory agency. *See AT & T Co.*, 524 U.S. at 222, 118 S.Ct. 1956.

The underlying principles of the filed rate doctrine are: (1) nondiscrimination— "preventing carriers from engaging in price discrimination as between ratepayers"; and (2) nonjusticiability—"preserving the exclusive role of [ ] agencies in approving rates for [ ] services that are 'reasonable' by keeping courts out of the rate-making process ... a function that the [ ] regulatory agencies are more competent to perform." *See, e.g., Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1316 (11th Cir.2004) (citation omitted); *Fax Telecommunicaciones Inc. v. AT & T*, 138 F.3d 479, 489 (2d. Cir.1998). *See also H.J. Inc.*, 954 F.2d at 488 (stating filed rate doctrine has been considered essential in preventing price discrimination and stabilizing rates) (quoting *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 132, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), *superseded on other grounds*, Negotiated Rates Act § 2(e)). Stated differently, the purpose of the filed rate doctrine is to: "(1) preserve the regulating agency's authority to determine the reasonableness of rates; and (2) insure that the regulated entities charge only those rates that the agency has approved or has been made aware of as the law may require." *H.J. Inc.*, 954 F.2d at 488.

As stated above, the fundamental principles of the filed rate doctrine precludes plaintiffs from challenging rates charged by a regulated entity when those rates have been properly filed with a regulatory agency. *See AT & T Co.*, 524 U.S. at 222, 118 S.Ct. 1956. Thus, even if the regulated entity intentionally misrepresents its rate to a customer, and the customer relies on the misrepresentation, the regulated entity cannot be held to the promised rate if it conflicts with the filed rate. *Id.* For example, if the regulated entity filed a rate of $.05 per minute for long distance telephone calls, but intentionally misrepresented the rate to a customer as $.03 per minute for long distance telephone calls, the filed rate doctrine prevents the regulated entity from honoring the $.03 rate. Once the rates are filed and approved, the "rights as defined by the [rate] cannot be varied or enlarged either by contract or tort of the [regulated entity]." *Keogh*, 260 U.S. at 163, 43 S.Ct. 47. Therefore, under the filed rate doctrine, courts cannot award the misrepresented customer the difference in price between the filed rate and the relied upon rate, i.e., $.02. *See AT & T Co.*, 524 U.S. at 222, 118 S.Ct. 1956. Regardless of how the claims are couched, courts cannot engage in retroactive rate making (by enforcing the $.03 rate or by awarding the difference between the promised rate and the filed rate), or second guess the agency's approval of such rates ($.05 unreasonably high). *See H.J. Inc.*, 954 F.2d at 488.

Moreover, the filed rate doctrine not only bars plaintiffs from challenging the filed rates, but it can also extend to services as well. That is, rates do not exist in isolation, as they have meaning "only when one knows the services to which they are attached." *AT & T Co.*, 524 U.S. at 223, 118 S.Ct. 1956. Therefore, the nondiscriminatory principle behind the filed rate doctrine would be defeated if courts allowed a claim for excessive rates to be couched as a claim for inadequate service, and vise versa. *Id.* Thus, discrimination in charges can "come in the form of a lower price for an equivalent service or in the form of an enhanced service for an equivalent price." *Id.* (citation omitted). Essentially, the filed rate doctrine prohibits a regulated entity from charging rates which are different than the rates filed, and "prohibits a party from recovering damages measured by comparing the filed rate and the rate that might have been approved absent the conduct at issue." *H.J. Inc.*, 954 F.2d at 488.

### 1. Does the filed rate doctrine apply to the insurance industry in Iowa?

To determine whether the filed rate doctrine bars Plaintiffs' claim for premium damages, the Court must first determine whether Iowa would apply the filed rate doctrine to the insurance industry. Although there appears to be no Iowa or Eighth Circuit cases extending the application of the filed rate doctrine to the insurance industry, the Iowa Supreme Court cases which have applied the filed rate doctrine in the telecommunications context are instructive. *See, e.g., Teleconnect Co. v. W. Commc'ns, Inc.*, 508 N.W.2d 644 (Iowa 1993). The Iowa Supreme Court has stated that the filed rate doctrine "recognizes that where a legislature has established a scheme for utility rate making, the rights of the rate-payer in regard to the rates he pays are defined by that scheme." *Id.* at 647–48 (quoting *Taffet v. S. Co.*, 967 F.2d 1483, 1490 (11th Cir.1992)). It would be logical then, to presume that the Iowa Supreme Court would apply the filed rate doctrine in the insurance context, given that Iowa legislatures have established a scheme for rate making in the insurance industry. *See generally* Iowa Code Ch. 515F.

Some courts which have reviewed the applicability of the filed rate doctrine to "new areas" have focused on one or more of the following factors: (1) the impact the court's decision will have on agency procedures and rate determinations; (2) whether there is an administrative agency to review the claim and provide a remedy; (3) whether there is meaningful review of rate increases; and (4) whether the damages are based upon the difference between the filed rate and the rate that would have been charged absent some alleged wrongdoing. Allan Kanner, *The Filed Rate Doctrine and Insurance Fraud Litigation*, 76 N. Dak. L.Rev. 1, 3 (2000) (citing *H.J. Inc.*, 954 F.2d at 485; *Calico Trailer Mfg. Co., Inc. v. Ins. Co. of N. Am.*, 155 F.3d 976 (8th Cir.1998); *Brown v. Ticor Title Ins. Co., Inc.*, 982 F.2d 386 (9th Cir.1992)).

The second and third factors identified above seem to assess the regulatory agency's authority. That is, without the ability to meaningfully regulate the rates at issue, the rationale behind applying the filed rate doctrine (rates approved by an agency are deemed to be per se reasonable and non-discriminatory) may not be appropriate. For example, if a regulatory agency is so powerless that it only rubber-stamps the rates filed, then it may be inappropriate to apply the filed rate doctrine. *See Hanson v. Acceleration Life Ins. Co.*, No. A3–97–152, 1999 WL 33283345, at *4 (D.N.D. Mar. 16, 1999). In *Hanson*, the district court declined to apply the filed rate doctrine in the long term care insurance industry in North Dakota. *Id.* The *Hanson* court noted that "North Dakota's regulation of long term care insurance is not comprehensive ... [as demonstrated by the] lack of statutory language requiring approval of rate increases ... no mechanism for meaningful review of rates filed with the Insurance Commissioner or public input in a rate determination, hearings or otherwise." *Id.* "Simply put, the North Dakota Insurance Commissioner does not have the authority to establish long term care insurance policy rates." *Id.; see* Kanner, *The Filed Rate Doctrine and Insurance Fraud Litigation*, 76 N. Dak. L.Rev. at 7–11, 13, 15–19 (discussing North Dakota Department of Insurance's lack of regulatory authority). In applying the second and third factors to Iowa's regulatory scheme, the Court believes that the filed rate doctrine would apply in the insurance context.

In Iowa, insurance rates are subject to a comprehensive regulatory scheme. *See generally* Iowa Code Ch. 515F. The purpose of Iowa's regulations is "to promote the public welfare by regulating insurance rates so that they are not excessive, inadequate, or unfairly discriminatory . . . ." Iowa Code § 515F.1. Iowa regulations require insurance entities to file with the Iowa Insurance Commissioner ("Commissioner"), "every manual, minimum premium, class rate, rating schedule, rating plan, and every other rating rule, and every modification of any of the foregoing which it proposes to use ... and shall indicate the character and extent of the coverage contemplated." Iowa Code § 515F.5. The Commissioner, upon review, may authorize or deny the filing. Iowa Code § 515F.5. Once approved, the Commissioner maintains the power to order the discontinuance of the use of the rate, if the Commissioner finds that the approved rate no longer meets the requirements of the rate standards. Iowa Code § 515F.6(2). The Commissioner continually administers the rates, and has the power to assess penalties and revoke licenses if entities deviate from the filings. Iowa Code §§ 515F.15, 515F.19. It appears, then, that the Commissioner has the authority to meaningfully regulate insurance rates in Iowa.

Given the purposes of the filed rate doctrine, the filed rate doctrine would equally apply to the insurance industry, as to other industries, where a state agency determines reasonable rates pursuant to a statutory scheme. *See Korte v. Allstate Ins. Co.*, 48 F.Supp.2d 647, 651 (E.D.Tex.1999). In light of the cases decided by the Iowa Supreme Court and the second and third factors outlined above,[9] the Court concludes that Iowa would apply the filed rate doctrine to the insurance industry. *See, e.g., Kirksey v. Am. Bankers Ins. Co. of Florida*, 114 F.Supp.2d 526, 529 (S.D.Miss. 2000) (applying filed rate doctrine to insurance companies). The Court will, in turn, determine whether the filed rate doctrine bars Plaintiffs' claims for premium damages.

### 2. Does the filed rate doctrine bar Plaintiffs' claims for premium damages?[10]

The Eighth Circuit has specifically stated that the "filed rate doctrine prohibits a party from recovering damages measured by comparing the filed rate and the rate that might have been approved absent the conduct at issue." *H.J. Inc.*, 954 F.2d at 488. Despite the claim actually alleged by Plaintiffs and Class I members, fraudulent inducement/rescission, the "focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations." *Id.* at 489.

State Farm argues that the premium damages sought by Plaintiffs and Class I members are barred by the filed rate doctrine because it would affect the rates lawfully filed with the Commissioner. State Farm contends that if Plaintiffs and Class I members recover all of the Upfront Endorsement premiums paid to date, then the Court would be engaging in retroactive rate making, effectively setting the reasonable Upfront Endorsement premium rate retroactively to zero. This type of rate making by the courts, State Farm argues, is prohibited by the filed rate doctrine. Plaintiffs, however, argue that the return of Upfront Endorsement premiums, as damages, do not implicate the filed rate doctrine because they are not "contest[ing] the amount of premium set by state regulators, the reasonableness of any rate or premium approval by any state or federal regulatory agency or insurance department, and [do] not request anything that would require the court to re-calculate the premium rate approved by any state or federal regulatory agency or insurance department." Third Am. Compl. ¶ 23. Plaintiffs argue that they are merely seeking to enforce the terms of the services State Farm filed with the Commissioner, which would not conflict with the filed rate doctrine. *See Randleman v. Fidelity Nat'l Title Ins. Co.*, 465 F.Supp.2d 812, 823 (N.D.Ohio 2006) (holding filed rate doctrine inapplicable because plaintiffs "are not challenging the reasonableness of the filed rate, but instead attempt[ing] to en-

**9.** The first and fourth factors are discussed in the following section.

**10.** In their Third Amended Complaint, named Plaintiffs only seek premium damages for themselves and Class I members. *See* Third Am. Compl. ¶¶ 21, 23, 38–55. State Farm also concedes that the application of the filed rate doctrine is limited to Count III (fraudulent inducement/rescission), asserted by Plaintiffs and Class I members. *See* Def.'s

Surreply at 5–6 ("Plaintiffs thus now limit themselves solely to their remaining request for premium damages on behalf of the Class I plaintiffs...."). Therefore, the Court will limit its discussion of the filed rate doctrine and its application to Plaintiffs and Class I members. Accordingly, the Court will not address Counts I and II, claims asserted by Plaintiffs and Class II members (as they do not seek premium damages).

force a contract incorporating a filed rate"). According to Plaintiffs, the Court would not be required to re-calculate premium rates because Plaintiffs only seek "rescissionary return of *all* money paid to State Farm to get the Upfront Endorsement...." Third Am. Compl. ¶ 23.

To support their argument, Plaintiffs cite to *Gulf States Utilities Company v. Alabama Power Company*, 824 F.2d 1465 (5th Cir.1987). In *Gulf States*, the Fifth Circuit held that contracts to purchase electricity at prices which were then incorporated in rate filings might be set aside if the plaintiff could show that it had been fraudulently induced to enter into the contracts. *Id.* at 1472. The *Gulf States* court distinguished setting aside the contract from setting aside the rates, noting that "setting aside the contracts ... would not interfere with the [agency's] rate-making powers." *Id.* Moreover, Plaintiffs point out that the filed rate doctrine is designed to protect utilities charging rates for lawfully provided service. *H.J. Inc.*, 954 F.2d at 490 (summarizing *Nordlicht v. New York Tele. Co.*, 617 F.Supp. 220, 227 (S.D.N.Y.1985)). There is nothing in the policy underpinning the doctrine which would cause it to protect a defendant which fraudulently induces a plaintiff to pay a filed rate, even at a lawful rate. *Id.* (summarizing *Nordlicht*, 617 F.Supp. at 227–28). Indeed, the "filed rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the common carrier provides to its customers the services covered under the tariff. It does not serve as a shield against all actions based in state law." *AT & T Co.*, 524 U.S. at 230–31, 118 S.Ct. 1956 (Rehnquist, J., concurring).

However; despite Plaintiffs' arguments to the contrary, the Eighth Circuit has specifically held that the filed rate doctrine is implicated if "the court's decision will have [an impact on] agency procedures and rate determinations." *H.J. Inc.*, 954 F.2d at 489. In *H.J. Inc.*, the plaintiffs alleged that Northwestern Bell bribed members of the Minnesota Public Utilities Commission to influence the officials setting the telephone rates in Minnesota. *Id.* at 486. The Eighth Circuit affirmed the dismissal of the plaintiffs' claims on the basis of the filed rate doctrine. *Id.* The plaintiffs argued that the filed rate doctrine should not apply because the doctrine could not be used to shield a defendant from its own fraudulent conduct. *Id.* at 488. The Eighth Court disagreed. The *H.J. Inc.* court reasoned that "the underlying conduct [of fraud] does not control whether the filed rate doctrine applies." *Id.* at 489. Rather, the applicability of the filed rate doctrine is controlled by whether "the court's decision will have [an impact] on agency procedures and rate determinations." *Id.* at 489. The court, therefore, expressly rejected the argument "that the filed rate doctrine does not apply on the face of fraudulent conduct." *Id.* at 492. The *H.J. Inc.* plaintiffs further argued that the damages sought did not implicate the filed rate doctrine. The plaintiffs argued that the court would not be engaged in rate making as the plaintiffs only sought damages due to Northwestern Bell's RICO violations. *Id.* at 491. The Eighth Circuit disagreed. The plaintiffs' claim was that they were injured because they paid too much for telephone services or that there could be no rate increases for the applicable period, 1980–1986. *Id.* at 492. This type of damages concept, the Eighth Circuit stated, fell squarely within the filed rate doctrine. *Id.* At the core, the plaintiffs sought damages that "challenge the rates previously approved by the Commission." *Id.* at 493.

██ Simply stated, under Eighth Circuit authority, the filed rate doctrine bars

certain damages when it would "necessarily and plainly challenge the rates previously approved by the Commission[er]." *Id.* For what it's worth, State Farm does not seek to dismiss Plaintiffs' fraudulent inducement/rescission claim, but rather, to dismiss the premium based *damages* that are sought by Plaintiffs and Class I members. The filed rate doctrine does not preclude Plaintiffs and Class I members from suing for "damages by having been deprived of benefits which were promised, and were consistent with the filed rate, but were not delivered," (like the damages sought by Plaintiffs and Class II members). *Richardson v. Standard Guar. Ins. Co.,* 371 N.J.Super. 449, 853 A.2d 955, 967 (2004). But, the filed rate doctrine does "preclude[ ] a claim for damages which would indirectly cause the application of rates different from the filed rates...." *Id.* Here, although the filed rate doctrine does not bar Plaintiffs' and Class I members' fraudulent inducement/rescission claim, the damages sought (return of all premiums paid for the Upfront Endorsement), would "necessarily and plainly challenge the rates previously approved by the Commission[er]." *H.J. Inc.,* 954 F.2d at 493. *See also Schermer v. State Farm Fire & Cas. Co.,* 721 N.W.2d 307, 316 (Minn.2006) (stating plaintiffs' claim for rescission seeking return of the payments already made is precisely what the filed rate doctrine prohibits). For all practical purposes, the damages sought can only be measured by comparing the difference between the premium rates the Commissioner originally approved with the premium rates the Commissioner should have approved absent the Upfront Endorsement provision. *See H.J. Inc.,* 954 F.2d at 488 (stating the "filed rate doctrine prohibits a party from recovering damages measured by comparing the filed rate and the rate that might have been approved absent the conduct at issue"); *see also Ark. La. Gas,*

453 U.S. at 578–79, 101 S.Ct. 2925 (stating damages sought amount to "nothing less than the award of a retroactive rate increase based on speculation about what the Commission might have done had it been faced with the facts of this case").

While Plaintiffs argue that the Court would not be involved in any rate making or be required to second guess the rate making agency because they merely seek the full return of all premiums for the Upfront Endorsement, the Court disagrees. *See Amundson & Assocs. Art Studio, Ltd. v. Nat'l Council on Comp. Ins., Inc.,* 26 Kan.App.2d 489, 988 P.2d 1208, 1215 (1999) (stating an award of common-law damages, the equivalent of a rate refund, would undermine the agency's regulatory scheme). As stated above, to appropriately measure Plaintiffs' and Class I members' damages, the Court would first have to determine the premiums paid for the Upfront Endorsement provision (as opposed to the premiums paid for the entire homeowner's policy), and then the Court would have to "second guess" what rate the Commissioner would have charged for each relevant Class Period for the homeowners' policies less the Upfront Endorsement provision. This type of rate making and damages concept "falls squarely within the filed rate doctrine." *H.J. Inc.,* 954 F.2d at 492; *see also Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 19 (2d Cir. 1994) (stating retroactive relief would lead to discrimination in rates in that a victorious plaintiff would end up paying less then similarly situated non-suing customers).

The Supreme Court acknowledged that the application of the filed rate doctrine "may seem harsh in some circumstances" and leave plaintiff's alleged state law violations unredressed. *AT & T Co.,* 524 U.S. at 223, 118 S.Ct. 1956 (citing *Maislin Indus., U.S., Inc.,* 497 U.S. at 130–31, 110 S.Ct. 2759). Nevertheless, the Supreme

Court accepted this result to prevent courts from upsetting agency authority. *See H.J. Inc.*, 954 F.2d at 492 (citing *Ark. La. Gas Co.*, 453 U.S. at 584, 101 S.Ct. 2925). Here, Plaintiffs allege that State Farm varied the terms of the service filed with the Commissioner. If proven to be true, the Commissioner may choose to assess penalties against State Farm for deviating from the terms of service filed. Under Iowa Code § 515F.19, the Commissioner may, upon finding that an organization has "violated a provision of [Chapter 515F], impose a civil penalty of not more than ten thousand dollars for each violation, but if the violation is found to be willful, a penalty of not more than twenty-five thousand dollars" for each violation. However, under the filed rate doctrine, the Court must bar Plaintiffs' and Class I members' request for "return of *all* money paid to State Farm to get the Upfront Endorsement policy," to the extent that it does not conflict with the other state laws which may become applicable under the conflicts of law analysis during the certification stage, if any.[11] Third Am. Compl. ¶ 23.

### 3. Nationwide Class Allegations

■■■■ Next, State Farm argues that Plaintiffs' nationwide allegations must be stricken and dismissed. Prior to the class certification stage, "[a] defendant may move to strike class allegations prior to discovery in rare cases where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." *Andrews v. Home Depot U.S.A., Inc.*, No. 03 cv 5200, 2005 WL 1490474, at *2 (D.N.J. June 23, 2005). Here, State Farm argues that Plaintiffs' nationwide class allegations must be stricken and dis-

missed because Plaintiffs cannot satisfy the commonality and superiority requirements of Rule 23(a) and (b)(3). State Farm contends that the substantive laws, including the statutes of limitations, governing Plaintiffs' claims vary from state to state such that maintaining a class action is not proper. Plaintiffs, on the other hand, assert that State Farm's motion is premature as class discovery has not yet been completed, and the Court, at this stage, cannot conduct a rigorous conflicts of law or Rule 23 analysis when Plaintiffs themselves do "not even know[ ] which states are at issue because class discovery has not yet revealed it. . . ." Pls.' Opp'n at 40. The Court agrees with Plaintiffs.

As an initial matter, if the Court were to follow State Farm's argument, then nationwide or multi-state class action suits could never exist because of the variance in each state's substantive laws. *But see Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (*Shutts I*). In *Shutts I*, the Supreme Court approved multi-state class action suits but remanded the case to the district court to conduct a choice of law analysis. *Id.* at 814–23, 105 S.Ct. 2965. After review of the applicable state laws, the district court, on remand, held that there was no conflict of laws between Kansas and other state laws implicated in the case. On appeal (*Shutts II*), the Kansas Supreme Court reviewed the laws of each of the eleven states involved in the case to determine the appropriate interest rate at issue. *Shutts v. Phillips Petroleum Co.*, 240 Kan. 764, 732 P.2d 1286, 1292–1314 (1987). Clearly, multi-state, and even nationwide class actions can be, and are, maintained in many instances. *See, e.g.,*

---

**11.** For example, North Dakota has specifically held that the filed rate doctrine is not applicable in the insurance industry. *See Hanson v. Acceleration Life Ins. Co.*, No. A3– 97–152, 1999 WL 33283345, at *3–5 (D.N.D. Mar. 16, 1999). *See also* Allan Kanner, *The Filed Rate Doctrine and Insurance Fraud Litigation,* 76 N. Dak. L.Rev. 1 (2000).

*Phillips Petroleum Co.,* 472 U.S. at 797, 105 S.Ct. 2965.

■ Since nationwide and multi-state class actions can be maintained, the Court will address, for the purpose of this present motion, whether Plaintiffs' have met the commonality and superiority requirements under Rule 23. Here, Plaintiffs have alleged sufficient facts to make a showing of Rule 23's applicability, and have further demonstrated that class discovery will produce information necessary to determine the appropriateness of a class action. *Hatfield v. Williams,* 64 F.R.D. 71, 75 (N.D.Iowa 1974). It appears to the Court that, during the course of discovery, Plaintiffs have gathered information allowing them to define a more specific class, limit the claims, and exclude certain states from the proposed class action. *Compare* Pls.' Second Am. Compl. *with* Pls.' Third Am. Compl. Indeed, "the shape and form of a class action evolves only through the process of discovery...." *Andrews,* 2005 WL 1490474, at *3 (citation omitted). Nevertheless, State Farm contends that the complaint itself demonstrates that the commonality and superiority requirements cannot be satisfied.

Rule 23(a)(2) requires the presence of common issues of law or fact. Fed. R.Civ.P. 23(a)(3). To establish commonality, "it is not necessary to demonstrate that *every* question of law or fact is common to each member of the class ... [r]ather, the issues linking the class members must be 'substantially related' to resolution of the case." *Liles v. Am. Corrective Counseling Servs., Inc.,* 231 F.R.D. 565, 573 (S.D.Iowa 2005). Here, Plaintiffs alleges that the claims of the class members turn on the same legal issue: whether State Farm provided the service, or intended to provide the service, as set forth in the Upfront Endorsement policies. Although there are, or may be, conflicts of law governing Plaintiffs' claims, it is premature for the Court to address that issue presently. Without further discovery, it is difficult to determine which state laws will be implicated in the class action suit. *See In re St. Jude Medical Inc.,* 425 F.3d 1116, 1120 (8th Cir.2005) (stating that district court must conduct a thorough conflicts of law analysis).

State Farm cites to *In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012, 1015 (7th Cir.2002), for the proposition that class action is not proper unless all litigants are governed by the same legal rules. In *In re Bridgestone,* the Seventh Circuit reversed the district court's order *certifying* the two nationwide classes explaining that it was improper for the district court to apply the laws of the defendant's headquarters (Michigan and Tennessee) to a nationwide class action suit where state laws differed on plaintiffs' theories of recovery. 288 F.3d at 1015. As noted previously, the Court will be required to conduct a rigorous analysis on the conflicts of law at the *certification* stage after further discovery, and may ultimately conclude that Plaintiffs cannot meet the commonality requirement. *See In re St. Jude Medical Inc.,* 425 F.3d at 1120. However, at this time, on State Farm's *motion to strike and dismiss,* it does not appear beyond doubt that Plaintiffs cannot establish an actionable class action lawsuit. *See Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 546 (8th Cir.1997). For example, Plaintiffs could possibly limit the multi-state class action to only include those states without conflicts of law, or possibly create a manageable number of sub-classes. Currently, it is unclear what state laws will be involved, or what claims will ultimately remain after the completion of class discovery. As Plaintiffs already amended their complaint to

narrow and specify the potential class members, applicable states, and claims, it would be more appropriate for the Court to address the commonality, i.e., conflicts of law analysis, during the class certification stage, after class discovery. *See Sanft v. Winnebago Indus., Inc.*, 214 F.R.D. 514, 519 (N.D.Iowa 2003) (summarizing that there can be no doubt that it is proper to allow discovery to determine whether the prerequisites of Rule 23 are satisfied and "ordinarily [such] determination should be predicated on more information than the pleadings will provide") (citation omitted).

■ The same reasoning also applies to Rule 23(b)(3)'s superiority requirement. Rule 23(b)(3) directs the Court to determine whether "class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Among the factors considered is "the difficulties likely to be encountered in the management of a class action." *Liles,* 231 F.R.D. at 576 (quoting Fed.R.Civ.P. 23(b)(3)(D)). Again, as stated above, it is premature to determine the manageability of the proposed class action lawsuit given that it is unclear which, and how many, varying state laws will be implicated. Taking the allegations in the Third Amended Complaint as true, the Court finds that the class allegations are sufficient to survive a motion to strike and dismiss. *See, e.g., Louis Ilfeld Co. v. Union Pac. R. Co.,* 23 F.2d 65, 69 (8th Cir. 1927) (stating lower court was required to take the allegations to be true when considering a motion to strike); *see also Stanbury Law Firm, P.A.,* 221 F.3d at 1063 (stating motions to strike "are viewed with disfavor and are infrequently granted").

## IV. CONCLUSION

For the reasons discussed above, State Farm's Combined Motion for Judgment on

the Pleadings on Plaintiffs' Claims for Premium Damages and Motion to Strike and Dismiss Plaintiffs' Nationwide Class Allegations (Clerk's No. 43) is GRANTED as to the Motion for Judgment on the Pleadings on Plaintiffs' Claims for Premium Damages, to the extent that it does not conflict with other state laws which may become applicable under the conflicts of law analysis, if any, and DENIED as to the Motion to Strike and Dismiss Plaintiffs' Nationwide Class Allegations.

IT IS SO ORDERED.