**Irene HOFFMAN, et al., Appellants,**

v.

**NORTHERN STATES POWER COMPANY, d/b/a Xcel Energy, Respondent.**

**No. A06–2275.**

Supreme Court of Minnesota.

April 16, 2009.

---

38 ■ ▆▆▆▆▆▆▆

Vincent J. Esades, Lori A. Johnson, Scott W. Carlson, Heins Mills & Olson, P.L.C., Minneapolis, MN; and C. Andrews Waters, Charles S. Siegel, Waters & Kraus, LLP, Dallas, TX; and Mark R. Stanley, Roger L. Mandel, Martin Woodward, Stanley, Mandel & Iola, L.L.P., Dallas, TX; and Jay E. Stuemke, Simon Eddins & Greenstone LLP, Dallas, TX, for appellants.

Timothy Thornton, Kevin M. Decker, Jonathan P. Schmidt, Briggs and Morgan, P.A., Minneapolis, MN, for respondent.

Lori Swanson, Attorney General, Karen D. Olson, Ronald M. Giteck, William T. Stamets, Assistant Attorneys General, St. Paul, MN, for amicus curiae Office of the Minnesota Attorney General—Residential and Small Business Utilities Division.

Lori Swanson, Attorney General, Alison C. Archer, Assistant Attorney General, St. Paul, MN, for amicus curiae Minnesota Public Utilities Commission.

David M. Cialkowski, Zimmerman Reed P.L.L.P., Minneapolis, MN; and Hart L. Rabinovitch, Zimmerman Reed P.L.L.P., Scottsdale, AZ; and Stephen Gardner, National Consumer Law Center, Dallas, TX, for amicus curiae National Association of Consumer Advocates.

OPINION

GILDEA, Justice.

Respondent Northern States Power Company ("NSP") supplies appellants Irene and David Hoffman (Minnesota), Jerry Ustanko (North Dakota), and Mulugeta Endayehu (South Dakota) with electrical power.[1] Appellants initiated a breach of contract action against NSP alleging that NSP failed to inspect and maintain the point of connection between NSP's service facilities and each customer's electrical equipment. Appellants argued that the filed tariff required the inspection and maintenance. Appellants demanded relief in the form of compensatory damages and either specific performance or an injunction to require NSP to perform what they alleged to be its tariff obligations. The district court denied NSP's motion for judgment on the pleadings and certified two questions to the court of appeals regarding whether the filed rate doctrine or the primary jurisdiction doctrine precluded the district court from adjudicating the action. The court of appeals held that the filed rate doctrine barred all of appellants' claims, *Hoffman v. N. States Power Co.,* 743 N.W.2d 751, 756 (Minn.App.2008), and we

---

1. The appellants seek to represent a class of plaintiffs. No action has been taken on class certification, and this appeal does not involve any class certification issues.

granted appellants' petition for further review.

We conclude that the filed rate doctrine applies to claims challenging the reasonableness of a rate the Minnesota Public Utilities Commission ("MPUC") has established for an electrical utility, and that the doctrine does not bar the claim for injunctive relief, but it does bar appellants' claim for compensatory damages. We further conclude that under the doctrine of primary jurisdiction, the district court should have referred appellants' claim for injunctive relief to the MPUC. Finally, we reverse the court of appeals' dismissal of claims brought by non-Minnesota residents and remand those claims for proceedings consistent with this opinion.

According to the complaint, NSP's wires connect to each customer's wires within a meter box, usually attached to the side of the customer's home. NSP sets up the meter box by attaching the utility's wires to grooved channels with brass lugs, which allows electricity to flow through the meter to the customer's wires. NSP then seals or locks the meter box, preventing customers from gaining access to its contents. The complaint alleges that the brass lugs within the box loosen and may corrode over time. These changes, according to the complaint, increase the electrical resistance at the connection site, generate heat, and. create a fire hazard. Appellants contend that inspections, along with cleaning and tightening the connection sites as needed, would prevent the dangerous condition. The complaint does not allege that any of customers in the proposed class have been the victim of any particular fire. Nor does the complaint allege that any NSP customer has engaged a third party to perform the inspection and maintenance services.

The services that NSP is obligated to perform for Minnesota customers are set forth under the tariff that NSP files with the MPUC.[2] As a public utility, NSP is a regulated monopoly under Minn.Stat. ch. 216B (2008). Thus, NSP files its tariffs with regulatory agencies in each state in which it operates, and the tariffs govern the terms of the legal relationship between NSP and its customers. *See, e.g.,* Minn. Stat. § 216B.05 (2008).

The complaint alleges that two separate provisions of the NSP tariff require NSP to inspect and maintain "the point of connection" between the company's wires and the customer's wires. The complaint first points to the tariff section titled "Service

---

**2.** The Minnesota Legislature has provided that all public utility schedules, rules, and service agreements will be filed with the MPUC:

> Subdivision 1. **Public rate filing.** Every public utility shall file with the commission schedules showing all rates, tolls, tariffs, and charges which it has established and which are in force at the time for any service performed by it within the state, or for any service in connection therewith or performed by any public utility controlled or operated by it.
>
> Subd. 2. **Schedule and rules filing.** Every public utility shall file with and as a part of the filings under subdivision .1, all rules that, in the judgment of the commission, in any manner affect the service or

> product, or the rates charged or to be charged for any service or product, as well as any contracts, agreements, or arrangements relating to the service or product or the rates to be charged for any service or product to which the schedule is applicable as the commission may by general or special order direct; provided that contracts and agreements for electric service must be filed as required by subdivision 2a.
>
> Subd. 2a. **Electric service contract.** A contract for electric service entered into between a public utility and one of its customers, ... must be filed for approval by the commission pursuant to the commission's rules of practice.

Minn.Stat. § 216B.05 (2008).

Connections," which provides for maintenance of NSP's equipment:

The customer, without expense to the Company, will grant the Company right-of-way on his premises for the installation and maintenance of the necessary distribution lines, service conductors, and appurtenances, and will provide and maintain on the premises, at a location satisfactory to the company, proper space for the Company's transformers, metering equipment, and appurtenances.

The service conductors as installed by the company from the distribution line to the point of connection with the customer's service entrance conductors will be the Company's property and will be maintained by the Company at its own expense.

The customer will provide for the safekeeping of the Company's meters and other facilities and reimburse the Company for the cost of any alterations to the Company's lines, meters, or other facilities necessitated by customer and for any loss or damage to the Company's property located on the premises. The exception is when such loss or damage is occasioned by the Company's negligence or causes beyond control of the customer.

*Northern States Power Company Tariff,* General Rules and Regulations § 5.5 (1998) [NSP Tariff].

The complaint further points to the tariff provision governing the "Customer's Wiring, Equipment, and Property." This provision makes the customer responsible for maintaining certain pieces of equipment but exempts the customer from responsibility for maintaining "metering equipment":

All wiring and equipment on customer's side of the point of connection, except metering equipment, will be furnished, installed, and maintained at the customer's expense in a manner approved by the public authorities having jurisdiction over the same.

Customer will protect all electrical equipment and systems with devices that conform to the industry accepted standard for the various classes of electrical equipment and systems to prevent fire or damage to equipment from electrical disturbances or fault occurring in the customer's system or in the supplying system. The "industry accepted standard" will be as required in the National Electric Code and such additional devices as are prescribed by any public authority with jurisdiction over the installation of all electrical facilities.

Any inspection of a customer's wiring and equipment by the Company is for the purpose of avoiding unnecessary interruptions of service to its customers or damage to its property and for no other purpose, and will not be construed to impose any liability upon the Company to a customer or any other person by reason thereof. In addition, the Company will not be liable or responsible for any loss, injury, or damage that may result from the use of or defects in a customer's wiring or equipment.

The Company may, however, at any time require a customer to make such changes in his electrical or nonelectrical property or use thereof as may be necessary to eliminate any hazardous condition or any adverse effect which the operation of the customer's property or equipment may have on said customer, other customers of the Company, the public, or the Company's employees, equipment or service. In lieu of changes by the customer, the Company may require reimbursement from the customer for the cost incurred by the Company in alleviating an adverse effect

on the Company's facilities caused by the customer's property.

The transformers, service conductors, meters, and appurtenances used in furnishing electric service to a customer have a definite capacity. Therefore, no material increase in load or equipment will be made without first making arrangements with the Company for the additional electrical supply.

*Id.* § 4.2.

Based on these tariff provisions, the complaint alleges a general obligation for NSP to inspect and maintain "points of connection." The tariff does not otherwise define a point of connection, but the complaint provides a varied list of equipment that might comprise the components of a point of connection. Specifically, the complaint states that NSP is to inspect and maintain: "its electrical wiring and equipment up through and including the connection between its wires and the customer's wires located within the meter box"; "its service facilities"; "the actual point of connection of its facilities to customers' equipment"; and "the connections which comprise the point of connection between its and its customers' service conductors." Appellants allege that NSP is in material breach of its inspection and maintenance obligations, and that the breach caused them damages in the amount of the fair market value for services not received over a six-year period. Because the tariff remains in effect, the complaint also demands specific performance and injunctive relief to cause NSP to comply with the tariff.

NSP moved the district court for judgment on the pleadings under Minn. R. Civ. P. 12.03. NSP argued that the filed rate doctrine bars appellants' claims, or, in the alternative, that the claims should be referred to the MPUC under the primary jurisdiction doctrine. NSP additionally argued that Minnesota courts lack jurisdiction over the out-of-state claimants and that the tariff does not mandate the services that appellants allege NSP must perform under the tariff. The district court denied the motion, holding that: (1) the filed rate doctrine does not bar appellants' claims, (2) the primary jurisdiction doctrine did not require the court to refer appellants' claims to the responsible agency, and (3) the language of the tariff is ambiguous and does not clearly support NSP's interpretation that appellants sought to impose additional inspection and maintenance obligations beyond those set forth in the tariff.

NSP then moved the district court under Minn. R. Gen. Pract. 115.04 and Minn. R. Civ.App. P. 103.03(i) to certify three issues for immediate appellate review. The district court certified two questions to the court of appeals: (1) "Does the filed rate doctrine bar [appellants'] claims?" and (2) "Does the primary jurisdiction doctrine require the court to [refer] resolution of the services required by the applicable tariffs to the responsible administrative agency?" [3] Concluding that the filed rate doctrine bars all of the claims, the court of appeals reversed the district court. *Hoffman*, 743 N.W.2d at 757. Because of its ruling on the filed rate doctrine, the court of appeals did not reach the primary jurisdiction issue. *Id.* at 752. The court also separately dismissed claims against NSP presented by North Dakota and South Dakota residents. *Id.* We granted appellants' petition to review the questions certified to the court of appeals.

---

**3.** The district court declined to certify the third issue regarding whether the tariff is ambiguous.

▮ This case comes to us within the context of the two questions the district court certified. On petition for review, the question originally certified is a question of law that we review de novo. *Watson by Hanson v. Metropolitan Transit Comm'n*, 553 N.W.2d 406, 411 (Minn.1996). In addition, because the case arises from the district court's denial of NSP's motion on the pleadings, the factual allegations in the complaint are accepted as true and we construe those allegations in the light most favorable to appellants. *Stephenson v. Plastics Corp. of Am.*, 276 Minn. 400, 150 N.W.2d 668 (1976). As noted above, NSP moved for judgment on the pleadings on the basis of both the filed rate doctrine and the primary jurisdiction doctrine. We examine each doctrine in turn.

## I.

We consider first the filed rate doctrine. The United States Supreme Court provided one of the earliest articulations of the filed rate doctrine in *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). The *Keogh* Court determined that the federal courts did not have jurisdiction to adjudicate an antitrust claim brought by a manufacturer against several carriers whose shipping rates were set and regulated by the Interstate Commerce Commission. *Id.* at 159–60, 43 S.Ct. 47. Jurisdiction did not exist in the federal court on an otherwise cognizable antitrust claim in that case because an award of damages would have caused the court to interfere with the Commission's rate-making function. *Id.* at 162, 43 S.Ct. 47.

▮ Courts have recognized that the filed rate doctrine as applied in *Keogh* is grounded in justiciability and separation of powers concerns and non-discrimination principles. *Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307, 312–313 (Minn.2006) (discussing rationale for doctrine as reflected in several cases). With regard to separation of powers and justiciability concerns, the doctrine recognizes that rate-setting is a legislative function and that courts are "ill-suited" to determine the reasonableness of rates established by the agency. *Id.* at 312; *see also Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 21 (2d Cir.1994) ("As compared with the expertise of regulating agencies, courts do not approach the same level of institutional competence to ascertain reasonable rates."). Regarding non-discrimination, the doctrine recognizes that a judicial damages award based on a speculative rate that might have been set absent the violation at issue in the case would create discrimination in the rate schedule by compensating some customers but not others. *Schermer*, 721 N.W.2d at 311; *see also Keogh*, 260 U.S. at 163–64, 43 S.Ct. 47 (finding that because Congress delegated ratemaking authority to the Interstate Commerce Commission for the purpose of preventing discriminatory rate schedules, courts lack the power to order refunds to customers who allege that they have paid an unjust price for the services provided by the regulated entity).

We first expressly recognized the filed rate doctrine in *Schermer*, 721 N.W.2d at 317. We held in *Schermer* that "the filed rate doctrine applie[d] generally to rates filed with and approved by" the Minnesota Department of Commerce (DOC) and therefore barred a class action brought against an insurance company to recover a surcharge on homeowner's insurance rates. *Id.* The insurance company based the surcharge on the age of the insured dwellings' electrical systems. *Id.* at 310. Customers complained that the surcharge created a discriminatory rate schedule based on race, in violation of a Minnesota statute prohibiting unfair discrimination for insurance rates. *Id.* at 309–10. We

pointed to the special expertise of agencies—their investigative capacities and experience with the insurance industry—to support the conclusion that "courts are ill-suited to second-guess" agency decisions regarding rate reasonableness. *Id.* at 312. We also acknowledged that the non-discrimination principle of the filed rate doctrine precluded relief for the *Schermer* plaintiffs because courts do not have power to retroactively reallocate rates. *Id.* at 315 ("Even though the amount of the surcharges actually paid by class members can be calculated, an award of that amount as damages would require the court to speculate about whether the DOC would have approved this lower, nonsurcharge rate as the reasonable and lawful rate."). Ultimately, we denied relief to the *Schermer* plaintiffs based on the comprehensive powers delegated from the legislature to the DOC to determine the reasonableness of insurance rates. *Id.* at 317.

◼ Our analysis of the filed rate doctrine in *Schermer* applies with equal force to private claims challenging the reasonableness of a rate established for an electrical utility under the administration of the MPUC. We have described the public regulation of utilities as "an intricate, ongoing process" subject to "an ever-widening set of consequences and adjustments." *Peoples Natural Gas Co. v. Minn. P.U.C.,* 369 N.W.2d 530, 535 (Minn.1985). In *Schermer,* we concluded that the filed rate doctrine applies to the insurance industry even though "the insurance regulatory scheme is less stringent than, for example, the scheme for electrical, gas, and telephone utilities." *Schermer,* 721 N.W.2d at 318.

◼ The legislature's broad grant of authority to the MPUC confirms what we implied in *Schermer* about the nature of the regulatory scheme for electrical utilities. In Chapter 216B the Minnesota Legislature vested extensive power in the MPUC to set and prospectively regulate rates for Minnesota's public utility companies. For example, the electrical utility regulatory scheme requires all public utilities to file "schedules showing all rates, tolls, tariffs and charges," as well as all rules and contracts relating to rates and services, with the MPUC. Minn.Stat. § 216B.05. The MPUC further enjoys broad power to "ascertain and fix just and reasonable" policies for all public utilities. Minn.Stat. § 216B.09, subds. 1 & 2 (2008). The MPUC actively regulates rate reasonableness, Minn.Stat. § 216B.16 (2008), and may adjust rates according to its own investigations and judgment, Minn.Stat. § 216B.23 (2008). Allowing courts to examine a utility rate structure that has been approved by the MPUC would infringe upon the authority delegated by the legislature to the MPUC, and would therefore run afoul of the filed rate doctrine.

Our decision that the filed rate doctrine applies to challenges that require courts to evaluate the reasonableness of an MPUC-approved tariff does not answer the question, however, of whether the doctrine operates to bar the claims appellants bring in this case. In order to make that determination, we must examine the nature of appellants' claims. *See Richardson v. Standard Guar. Ins. Co.,* 371 N.J.Super. 449, 853 A.2d 955, 965 (2004) (noting that "a determination as to the manner in which the filed rate doctrine impacts upon plaintiff's complaint requires an examination of the asserted causes of action"). For NSP's alleged breach of contract, the complaint seeks both injunctive relief (count II) and compensatory damages (count I). We turn next to an examination of whether the filed rate doctrine bars either or both of these claims.

A.

We look first at appellants' request for

injunctive relief.[4] Appellants argue that they are not questioning the reasonableness of the filed rate; they are simply asking the court to enforce the clear terms of the tariff. NSP, in essence, argues that the filed rate doctrine bars even judicial enforcement of clear tariff language. NSP also argues that even if the court could, consistent with the filed rate doctrine, enforce clear language in the tariff, appellants' claim would still be barred because appellants are not seeking to enforce terms in the tariff, but are seeking to add terms to the tariff.

We agree with appellants that, at least in the absence of a legislative decision to vest exclusive jurisdiction in the agency, the filed rate doctrine does not bar a court from considering a request to enforce the clear terms of an agency-approved tariff.[5] *See Brown v. MCI World-Com Network Servs., Inc.,* 277 F.3d 1166, 1171–72 (9th Cir.2002) (holding that the filed rate doctrine did not bar a class action suit against a telephone company for a faulty system of account-number assignments that resulted in charging customers for more accounts than actual phone lines because enforcement of the per-phone-line charge did not challenge the rate per phone line directly or indirectly); *Lipton v. MCI Worldcom, Inc.,* 135 F.Supp.2d 182, 189 (D.D.C.2001) (holding that the filed rate doctrine did not bar the plaintiff's challenge to the telephone company's compliance with a tariff because the plaintiff did not seek to "alter the terms and conditions" or enforce an agreement separate from the tariff); *see also Richardson,* 853 A.2d at 967 (holding that the

filed rate doctrine did not bar a claim "that the insurer breached the policy as written"). The judiciary may act in such a case because claims that merely seek enforcement of an existing tariff do not question the reasonableness of rates charged under the tariff or require courts to determine the services to be provided by the regulated entity in exchange for those rates. Judicial enforcement of the clear terms of a tariff, therefore, cannot be said to infringe on discretionary authority vested in the agency or lead to discriminatory rate-making. The judiciary is simply asked to enforce the terms of a tariff as written, just as it would in an ordinary contract action. *See Penn Cent. Co. v. General Mills, Inc.,* 439 F.2d 1338, 1340 (8th Cir.1971) (applying principles of contract construction to tariff).

Claims that seek to expand services beyond what is provided for in the tariff, on the other hand, indirectly challenge the reasonableness of the filed rates, and the filed rate doctrine bars the judiciary from considering such claims. *See, e.g., ICOM Holding, Inc. v. MCI Worldcom, Inc.,* 238 F.3d 219, 222–23 (2d Cir.2001) (holding that the filed rate doctrine barred a state law breach of contract claim because "the relief sought in the plaintiff's state-law claims would conflict with the provisions of the filed tariff"). The United States Supreme Court has noted that "[r]ates ... do not exist in isolation. They have meaning only when one knows the services to which they are attached. Any claim for excessive rates can be couched as a claim for inadequate services and vice versa." *Am. Tel. & Tel. Co. v. Cent. Off.*

---

4. Our discussion of appellants' claim for injunctive relief applies equally to the claim for specific performance of tariff obligations.

5. Where the legislature provides for exclusive agency jurisdiction, the separation of powers principles that underlie the filed rate doctrine

may bar the judiciary from acting. But we need not resolve that question in this case because, as discussed below, the legislature did not provide for exclusive jurisdiction in the MPUC.

*Tel.*, 524 U.S. 214, 223, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) (holding that claims based in breach of contract for a regulated entity's misrepresentation of the services promised in exchange for payment of the filed rate cannot be enforced through the courts). If the services requested in the litigation are not part of the original tariff obligations, the courts cannot, consistent with the filed rate doctrine, require performance of those services.

▬ Whether the filed rate doctrine bars appellants' claim for injunctive relief therefore depends on whether appellants seek to enforce the language of the tariff, as appellants contend, or whether they seek to add to the terms of the tariff, as NSP contends. The procedural posture of this case requires that we construe the complaint in favor of appellants and leads us to conclude that the filed rate doctrine does not bar appellants' claim for injunctive relief.

NSP moved the district court to enter judgment on the pleadings under Minn. R. Civ. P. 12.03, asserting that the plaintiffs' complaint failed to state a claim upon which relief can be granted. When reviewing a Rule 12.03 motion for judgment on the pleadings, we accept the factual allegations in the pleading under attack (here, the complaint) as true and we liberally construe the complaint and draw all inferences and assumptions in favor of the nonmoving party (appellants). *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 623 (Minn.2007); *see also State ex rel. City of Minneapolis*, 238 Minn. 218, 223, 56 N.W.2d 564, 567 (1952); *Gostomezik v. Gostomezik*, 191 Minn. 119, 120, 253 N.W. 376, 377 (1934) (noting that a motion for judgment on the pleadings "will not be sustained if by a liberal construction the pleading can be held sufficient").

We have examined the tariff sections at issue in the complaint. These sections, especially when construed in the light most favorable to appellants, establish that NSP must maintain certain equipment. For example, the tariff requires that customers give NSP access to their premises "for the installation and *maintenance* of the necessary distribution lines, service conductors, and appurtenances." NSP Tariff § 5.5 (emphasis added). In addition, the service conductors that NSP installs, being the company's property that runs "from the distribution line to the point of connection with the customer's service entrance conductors . . . *will be maintained* by [NSP] at its own expense." *Id.* (emphasis added). Finally, the tariff provides under section 4.2, "[a]ll wiring and equipment on customer's side of the point of connection, *except metering equipment,* will be furnished, installed, and *maintained* at the customer's expense." NSP Tariff § 4.2 (emphasis added).

▬ Appellants allege that NSP has breached its maintenance obligation. We cannot completely define the scope of NSP's maintenance obligation at this early stage of the litigation. But, as set forth above, when the tariff is construed in the light most favorable to appellants, NSP bears a duty to maintain some "metering equipment," and "service conductors," as well as "distribution lines" and components constituting "appurtenances." Construing the complaint liberally and making assumptions in favor of appellants' contentions, that equipment may include components found at points of connection. Given that the tariff requires that NSP maintain some equipment, we cannot conclude that there is no set of facts under which appellants could prevail on their claim that they are simply seeking to enforce the tariff as approved by MPUC. We therefore hold that the filed rate doctrine does not bar

the district court from proceeding with appellants' claim for injunctive relief.[6]

### B.

■ We turn next to consider appellants' claim for compensatory damages. If a complainant has paid the filed tariff rate, courts do not have power to order a refund of any portion of that rate. *Keogh,* 260 U.S. at 163, 43 S.Ct. 47. Such an attempt to measure damages with reference to the filed rate would interfere with the schedule of rates approved by the agency and would constitute a retroactive rate adjustment contrary to the separation of powers principles that underlie the filed rate doctrine. In addition, judicial interference with approved rates would create a discriminatory rate schedule among customers, with customers who receive damages effectively paying less than those who do not. For both of these reasons, courts have recognized that the filed rate doctrine bars claims for money damages to remedy breach of a provision in an agency-approved tariff. *Ark. La. Gas Co. v. Hall (Arkla),* 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (holding that filed rate doctrine bars a consumer of a regulated product from paying any rate other than the filed rate); *see also Crumley v. Time Warner Cable, Inc.,* 554 F.Supp.2d 933, 936–37 (D.Minn.2008) (concluding that the filed rate doctrine barred claim for damages and declaratory relief based on services not performed under settlement agreement because claim challenged rate reasonableness); *Rios v. State Farm Fire & Cas. Co.,* 469 F.Supp.2d 727, 739 (S.D.Iowa 2007) (concluding that the filed rate doctrine barred claim for rescission on insurance policy because return for full amount of paid premiums would challenge the agency-approved rates).

**6.** The concurrence contends that we should decline to answer the certified question as to the claim for injunctive relief because "[u]nder appellants' interpretation of the tariff, the claim for injunctive relief can go forward; [but] under NSP's interpretation of the tariff, the claim is barred by the filed rate doctrine." The question certified, however, assumes precisely the conflicting interpretations the concurrence cites, and asks whether the filed rate doctrine bars the court from proceeding when the tariff is open to those conflicting interpretations. This case therefore presents a situation appropriate for certification because "the record is developed to the point where the question is relevant and presents a substantive issue." *Thompson v. State,* 284 Minn. 274, 277, 170 N.W.2d 101, 103 (1969). The certified question presented here is not similar to the question certified in the cases the concurrence cites where we determined that the question posed was not appropriate for certification. The result in *Staples v. Zinn,* 302 Minn. 149, 152–53, 223 N.W.2d 415, 416–17 n. 2 (1974), illustrates this difference. The question certified there was whether res judicata applies to a judgment entered in conciliation court. Because the judgments that had been entered in conciliation court had been vacated, the question certified was mere-

ly hypothetical and thus not appropriate for certification. *See also F. & H. Invest. Co. v. Sachman–Gilliland Corp.,* 305 Minn. 155, 158, 232 N.W.2d 769, 772 (1975) ("[T]he question [of the constitutionality of the foreclosure by advertisement statute as applied] is not appropriate for certification because of the outstanding issues of fact which must necessarily be determined and, as well, because certified questions of law must be brought to this court after having been decided by the lower court. The mere denial of a motion for judgment because of a broad allegation of unconstitutionality is not the kind of question contemplated for certification within the rule."); *Thompson,* 284 Minn. at 277, 170 N.W.2d at 103 (holding that certification was not appropriate because question presented was "abstract [and] unnecessarily general"); *Rude v. Rude,* 283 Minn. 524, 525, 166 N.W.2d 719, 719 (1969) (per curiam) (holding that question as to "the 'standard of care required by a plaintiff in the act of rescuing personal property' " would not be considered under appellate rule allowing for certified questions because the standard of care "has already been fully stated" (quoting *Henjum v. Bok,* 261 Minn. 74, 77, 110 N.W.2d 461, 463 (1961))).

We recognized these dual reasons for barring the claim for damages in *Schermer*. In that case, we determined that plaintiffs' claim that a surcharge on insurance rates for homes older than 39 years was unlawful would have caused the court to "necessarily interfere with the function delegated by the legislature to the [agency, without] the expertise [or] the mechanisms to deal with the entire rate structure or the adequacy of the return to the regulated entity." 721 N.W.2d at 315. Our decision in *Schermer* also recognizes the potential for discriminatory rates in the event that courts assess damages for breach of agency-approved tariff provisions. We recognized that "if the court were to retroactively adjust the rates of only the Class members, it would inevitably disrupt the balancing of interests achieved by the [agency] .... because the court has no jurisdiction to reallocate rates among other customer classes...." *Id.*

■ Appellants, in essence, argue that the rule we applied in *Schermer* does not control here because they are not seeking a "refund of approved rates." Rather, they are seeking compensatory damages based on the amount of the fair market value of inspection and maintenance services. The complaint seeks damages that would give appellants the benefit of their bargain and put them in the same position as they would have been if NSP had performed the inspection and maintenance services that the appellants claim NSP is obligated to perform under the tariff. Appellants allege that this measure of damages would not require calculation of damages based on rates, but based on the market value of the services not per-

formed, and therefore would not create an effective rate refund.

■ But appellants essentially claim an overcharge for services actually performed under the tariff, compared to the services appellants claim the tariff required to be performed. These damages are measured as the difference between what the appellants actually paid for the performance of the service not received and the presumably lesser amount they would have paid had the services not been required in the tariff. *See, e.g., Marcus v. AT&T Corp.,* 138 F.3d 46, 60–61 (2d Cir.1998) (stating that compensatory damages for fraud have the effect of creating a discounted rate where appellants based measure of damages on "best alternative rate available"); *H.J., Inc. v. Nw. Bell. Tel. Co.,* 954 F.2d 485, 492 (8th Cir.1992) (holding that damages for telephone company's wrongdoing challenge rate reasonableness and "fall[ ] squarely within the filed rate doctrine"). The measure of damages in this case is therefore inextricably linked to the filed rate. The rate-setting process is an intricate proceeding by which the agency takes into account many aspects of cost and capital. *Peoples Natural Gas Co.,* 369 N.W.2d at 535. The costs incurred by NSP to render its services necessarily are accounted for when the agency engages in the procedure to set the rate. Minn.Stat. § 216B.16, subd. 6 (2008) (explaining that the commission considers the consumer's need and cost for providing adequate, efficient, and reasonable services when exercising authority to set just and reasonable rates). The judiciary is not competent to engage in rate analysis, nor, consistent with separation of powers principles, should the courts encroach on this legislative function.[7]

7. Some courts have recognized that the filed rate doctrine does not bar every claim for damages that must be measured with respect to the filed rate. For example, in *Brown v.*

*MCI WorldCom Network Servs., Inc.,* 277 F.3d 1166, 1171–72 (9th Cir.2002), the Ninth Circuit concluded that the filed rate doctrine would not bar an award of damages in the

Finally, awarding appellants money damages for services they claim NSP was required to perform, but that they did not receive, would result in appellants paying less for the electrical services than non-class members. As we recognized in *Schermer*, the filed rate doctrine is designed to protect against such discrimination between ratepayers. 721 N.W.2d at 315.

Because appellants' claim for compensatory damages implicates the reasonableness of the agency-approved rate and would lead to discrimination between ratepayers, we hold that the filed rate doctrine bars this claim.

## II.

Because of its conclusion that the filed rate doctrine bars both of appellants' claims, the court of appeals did not reach the primary jurisdiction doctrine question certified by the district court. As set forth above, we have concluded that the filed rate doctrine does not bar appellants' claim for injunctive relief. Accordingly, NSP's contention that the primary jurisdiction doctrine bars the claim for injunctive relief must be addressed.

Although we could remand consideration of the primary jurisdiction question to the court of appeals, the interests of judicial economy counsel that we address the question here. We thus turn to consider whether the district court should have referred appellants' injunctive relief claim to the MPUC under the primary jurisdiction doctrine. Because this question comes to us within the context of a certified question, we review the application of the primary jurisdiction doctrine using a de novo standard. *Watson by Hanson v. Metro. Transit Comm'n,* 553 N.W.2d 406, 411 (Minn.1996).

The primary jurisdiction doctrine "is a judicially-created doctrine [that] is concerned with the orderly and sensible coordination of the work of agencies and courts." *State, by Pollution Control Agency v. United States Steel Corp.,* 307 Minn. 374, 380, 240 N.W.2d 316, 319 (1976). The doctrine seeks to strike a proper relationship between courts and agencies, especially if an issue before the court requires the particular competence and expertise of the agency. *City of Rochester v. People's Co-op. Power Ass'n,* 483 N.W.2d 477, 480 (Minn.1992) (citing *United States v. W. Pac. R.R. Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)); *see also S. Utah Wilderness Alliance v. Bureau of Land Mgmt.,* 425 F.3d 735, 751 (10th Cir.2005) (noting that pri-

amount that the customer was overcharged above the enforceable rate. *Brown* is distinguishable from this case because appellants do not allege that they paid more than the specific rate set forth in the tariff. Instead, appellants allege that their damages arise from a deficiency of services. Appellants' claim suggests that the filed rate is too high if, in fact, NSP did not perform the services that the tariff prescribes. A court may not entertain such a claim without implicating rate reasonableness under the filed rate doctrine. *See, e.g., Wegoland Ltd.,* 27 F.3d at 21–22 (filed rate doctrine barred RICO action that would require the court to determine a reasonable rate absent the fraud because court

was incompetent to evaluate rate reasonableness); *H.J., Inc.,* 954 F.2d at 493 (dismissing RICO action because damages sought to compensate for excessive service charges constituted a retroactive rate adjustment); *Taffet v. Southern Co.,* 967 F.2d 1483, 1491–92 (11th Cir.1992) (same); *Gulf States Utilities Co. v. Alabama Power Co.,* 824 F.2d 1465, 1472 (5th Cir.1987) (en banc) (filed rate doctrine barred breach of contract claims seeking "relief based on a rate different from the filed rate," but did not bar fact question about the quantity of electrical power sold, where contract was between two utilities and not filed with agency).

mary jurisdiction doctrine promotes regulatory uniformity).

The United States Supreme Court recognizes the primary jurisdiction doctrine as a prudential measure under which a court acknowledges that, even if the court may review the claims before it, the claims involve some issues that are better suited to the special competence and expertise of a regulating agency. *Reiter v. Cooper,* 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). Putting off the judicial proceedings for a time allows the parties to seek resolution of those issues in the agency before resuming litigation in court. *Id.* In such a situation, the district court has discretion to determine whether to stay the proceeding or dismiss the claims without prejudice. Dismissal may be appropriate if the parties would not be unfairly disadvantaged. *Id.*

Courts have recognized several factors in assessing whether to apply the doctrine. We have acknowledged at least two factors: (1) whether the legislature explicitly granted the agency exclusive jurisdiction; and (2) whether the issues raised are "inherently judicial." *City of Rochester,* 483 N.W.2d at 480.[8] The district court applied these two factors in determining that the primary jurisdiction doctrine did not "bar[ ]" appellants' action.

▇ Turning to the exclusive jurisdiction question, NSP argues that the comprehensive powers for ratemaking and regulation delegated to the MPUC under Minn.Stat. ch. 216B amount to exclusive jurisdiction in the agency. *See Subaru of*

*Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 222–23 (Tex.2002) (noting that a "pervasive regulatory scheme" can create exclusive jurisdiction, but finding that the statute at issue explicitly provided for "exclusive, original jurisdiction" in the agency). But NSP points to no statutory provision, nor do we find one, that explicitly confers exclusive jurisdiction on the agency over tariff interpretation and enforcement. This silence weighs in favor of judicial jurisdiction. *See Abraham v. County of Hennepin,* 639 N.W.2d 342, 346–47 (Minn.2002) ("Ordinarily, unless a statute provides that its remedy is exclusive, a party should not be prevented from bringing concurrent claims."); *City of Rochester,* 483 N.W.2d at 480 ("The [primary jurisdiction] doctrine is inapplicable if the issues raised are 'inherently judicial,' unless the legislature has *explicitly granted* exclusive jurisdiction to the administrative body.'" (quoting *Manchester Terminal Corp. v. Tex. TX TX Marine Transp., Inc.,* 781 S.W.2d 646, 649 (Tex.Ct.App. 1989) (emphasis added))). We agree with the district court that the Minnesota Legislature has not vested in the MPUC exclusive jurisdiction over claims related to the tariffs of regulated utilities.

But this determination is not dispositive for purposes of the primary jurisdiction doctrine. We must still examine whether issues raised in the case are "inherently judicial." In making this determination, we look to whether the case "rais[es] issues of fact not within the conventional experience of judges," or whether the case "'require[s] the exercise of administrative

---

8. Other courts have examined the doctrine using these factors: (1) the traditional experience of judges; (2) agency expertise and prerogative for discretion; (3) the likelihood that the court's ruling will differ from the agency and erode uniformity; and (4) whether the parties have already applied for agency adjudication. *AT & T v. MCI Commc'ns Corp.,* 837 F.Supp. 13, 16 (D.D.C.1993); *see also MCI Commc'ns Corp. v. AT & T,* 496 F.2d 214, 223 (3d Cir.1974) (assuming that questions raised were "within the ordinary experience of the judiciary," but staying the action under the primary jurisdiction doctrine for additional prudential considerations).

discretion.' " *State, by Pollution Control Agency,* 307 Minn. at 380, 240 N.W.2d at 319 (quoting *Far E. Conference v. United States,* 342 U.S. 570, 574–75, 72 S.Ct. 492, 96 L.Ed. 576 (1952)). Apparently because this case sounded in breach of contract, the district court concluded that the issues raised in the case did not ·"require any 'special competence,' " and therefore were inherently judicial. We disagree.

Appellants contend that tariff interpretation is as inherently judicial as contract interpretation because the tariff language plainly and unambiguously creates a duty for NSP to inspect and maintain "the point of connection." *See Minn.-Iowa Television Co. v. Watonwan T.V. Improvement Ass'n,* 294 N.W.2d 297, 303 (Minn.1980) (concluding that the court is competent to adjudicate whether a contract between a regulated TV station and a nonprofit organization violates state antitrust law). We agree that the court is competent to enforce duties plainly described in the tariff. But in this action, as the district court found, the tariff is open to interpretation. To interpret the tariff and therefore define NSP's obligations, the court must construe technical terms relating to particular electrical utility equipment, such as "point of connection," "appurtenances," "meter box," and "service conductors." Where, as in this case, the judiciary's role in construing the tariff is complicated because the dispositive terms "are used in a peculiar or technical sense," and "extrinsic evidence is necessary to determine their meaning or proper application," the primary jurisdiction doctrine counsels referral to the agency. *W. Pac. R.R. Co.,* 352 U.S. at 66, 77 S.Ct. 161.

Several courts have referred matters to administrative agencies in precisely such a circumstance. For example, in *Western Pacific,* the Supreme Court was presented with a tariff that would have required the Court to determine whether the railroad shipping rates for "incendiary bombs" included steel casings filled with napalm gel. *Id.* at 60–61, 77 S.Ct. 161. The Court acknowledged that tariff construction is appropriate in some cases, but nevertheless referred the matter to the agency for a definition of "incendiary bombs." *Id.* at 66, 77 S.Ct. 161. The rate set for shipping the "incendiary bombs," according to the Court, had been determined after a cost-allocation analysis that considered safety measures for "handling, supervising, and insuring an inherently dangerous cargo." *Id.* Because the agency was familiar with the factors that informed the decision to create the particular rate for shipping the particular freight in question, the Court concluded that the agency would be better suited to rule on the applicable rate. *Id.* at 67, 77 S.Ct. 161. The Court explained that, "where ... the problem of cost-allocation is relevant, and where therefore the questions of construction and reasonableness are so intertwined that the same factors are determinative on both issues, then it is the Commission which must first pass on them." *Id.* at 69, 77 S.Ct. 161.

The Eighth Circuit similarly applied the primary jurisdiction doctrine to invoke agency expertise for construction of a telephone company tariff. *Access Telecomm. v. Sw. Bell Tel. Co.,* 137 F.3d 605, 608 (8th Cir.1998). The company argued that when more than 6,000 feet of wire were required to provide the requested service, the company had to use a different set of wires with the result of bumping the customer into a more costly category of rates. *Id.* The tariff, however, did not provide for a length of the wire that would limit the application of the less-expensive-rate category. *Id.* To determine whether the 6,000–foot limitation was reasonable, the court referred the matter to the agency under the primary jurisdiction doctrine in order to take advantage of agency exper-

tise and experience with such technical items as "circuit designs, signal transmissions, noise attenuation, and echo return loss." *Id.* at 609. This deference was appropriate, the court held, even though the claim alleged mere violation of the tariff as written, because of the technical nature of the questions before the court. *Id.* at 608–09.

The Third Circuit considered an action brought by MCI Communications Corporation against AT & T Company in which MCI alleged that AT & T was responsible for providing certain connection services mandated by the Federal Communications Commission pursuant to the filed tariff. *MCI Commc'ns Corp. v. AT & T,* 496 F.2d 214, 215–16 (3d Cir.1974). The court of appeals vacated the preliminary injunction issued by the district court that ordered AT & T to provide these services because agency expertise was needed to interpret precisely which interconnection services were owed under the FCC order and because an action to resolve the same issues was pending before the agency. *Id.* at 221. The court found that, in addition to uncertainty about the scope of the duties, the nature of the issue involved a "comparative evaluation of complex technical, economic, and policy factors, as well as a consideration of the public interest" that the agency was in the best position to handle. *Id.* at 222.

Like the claims in all of these cases, appellants' claim for injunctive relief requires technical knowledge and experience that makes the tariff construction issue in this case best suited for a first consideration by the MPUC. Because the scope of NSP's services is dependent upon technical, undefined terms in the tariff, agency expertise will provide much-needed perspective for the construction of the NSP tariff. Moreover, the MPUC is in the best position to consider these questions, as the legislature entrusted the commission with setting the rates based on the scope of the services NSP was to perform. We therefore hold that the injunctive relief claim should be referred first to the agency under the primary jurisdiction doctrine.

■ Upon referral of this claim to the agency, the court has discretion to dismiss the action or simply stay it. *See Reiter,* 507 U.S. at 268–69, 113 S.Ct. 1213. A stay is warranted where, after appropriate issues have been referred to the proper agency, claims remain over which the court retains jurisdiction. *Ricci v. Chicago Mercantile Exch.,* 409 U.S. 289, 302, 305–06, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973) (affirming court of appeal's stay of antitrust action predicated on violation of a Commodity Exchange Commission rule so that the commission could first decide whether its rule was violated before the court would address the immunity question raised under the antitrust statute). Courts may also stay litigation where a party would find great difficulty in resurrecting a valid claim on account of a statute of limitations that might expire while the parties pursue proceedings in the agency. *Carnation Co. v. Pac. Westbound Conference,* 383 U.S. 213, 222–23, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966) (reversing the court of appeal's dismissal of the action and ordering a stay because the treble damages sought under the antitrust statute would likely be barred by the statute of limitations before the commission resolved the referred issue and distinguishing a claim seeking injunctive relief based on continuing conduct that would not be barred); *Laveson v. Trans World Airlines,* 471 F.2d 76, 83 (3d Cir.1972) (vacating district court dismissal and ordering stay of proceedings because the antitrust cause of action seeking treble damages would be subject to a four-year statute of

limitations which could expire before the agency acted on the claim).

By contrast, courts may dismiss the litigation without prejudice if all claims turn on one central claim that will be resolved by the agency. *Total Telecomm. Servs. v. AT & T Co.*, 919 F.Supp. 472, 483–84 (D.D.C.), *aff'd*, 99 F.3d 448, 1996 WL 590872 (D.C.Cir.1996) (finding dismissal proper where central claims alleging violation of the Communications Act now referred to the agency would be dispositive of other claims based in breach of contract, intentional interference with business relations, and quantum meruit). Likewise, a court will not abuse its discretion by dismissing litigation that would not be barred from future judicial consideration by a statute of limitations. *Far E. Conference v. United States*, 342 U.S. 570, 577, 72 S.Ct. 492, 96 L.Ed. 576 (1952) (concluding that dismissal was proper and a stay was not necessary for a claim seeking to enjoin violations of antitrust law because the claim could be appealed to the courts after the agency proceeding and any future claim could be "easily initiated later"); *Access Telecomm.*, 137 F.3d at 609 (affirming district court's dismissal of suit because the statute of limitations that would have applied to the action in the district court was not implicated in light of the agency's statutory timeline for addressing the complaint).

The decision to stay or dismiss without prejudice, however, is at the discretion of the district court. *See Access Telecomm.*, 137 F.3d at 609. The parties did not argue this issue to the district court, nor was the issue briefed to the court of appeals or to this court. We therefore remand the question of whether the injunctive relief claim should be dismissed without prejudice or stayed to the district court for a disposition consistent with this opinion.

## IV.

We turn finally to consider the court of appeals' dismissal of claims asserted on behalf of North Dakota and South Dakota residents. *Hoffman*, 743 N.W.2d at 757. The district court in this case did not certify to the court of appeals the question of whether to dismiss the out-of-state claims. This issue therefore was not properly before the court of appeals. We reverse the court of appeals ruling and reinstate the claims of the North Dakota and South Dakota residents. We remand those claims to the district court for disposition consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

MAGNUSON, C.J., Took no part.

DIETZEN, Justice (concurring).

I agree with the majority's conclusion that appellants' claim for compensatory damages is barred under the filed rate doctrine, but I disagree that appellants' claim for injunctive relief is not barred under the filed rate doctrine. Because I conclude that the relevant provisions of the tariff are ambiguous, I would decline to answer the certified question as to whether the filed rate doctrine bars the claim for injunctive relief. I would simply refer appellants' claim for injunctive relief to the Minnesota Public Utilities Commission (MPUC) to resolve the ambiguity in the tariff.

Like the majority, I conclude that the filed rate doctrine does not bar a claim for injunctive relief that merely seeks to enforce the terms of an existing tariff. *See, e.g., Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1171–72 (9th Cir.2002); *Lipton v. MCI Worldcom, Inc.*, 135 F.Supp.2d 182, 189 (D.D.C.2001).

Therefore, the dispositive issue here is whether appellants merely are seeking to enforce the terms of the tariff or whether they are seeking to add obligations to the tariff. The resolution of this issue depends on the scope of NSP's maintenance obligation as set forth in the tariff, which requires interpretation of the tariff.

Courts typically interpret tariffs using the same principles as contract interpretation. *See Carrier Serv., Inc. v. Boise Cascade Corp.*, 795 F.2d 640, 642 (8th Cir. 1986). Unless ambiguous, the construction and effect of a contract constitutes a question of law. *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn.2003). The determination of whether a contract is ambiguous also constitutes a question of law. *Id.* "A contract is ambiguous if its language is reasonably susceptible to more than one interpretation." *Brookfield Trade Ctr., Inc. v. County of Ramsey*, 584 N.W.2d 390, 394 (Minn.1998). When material contractual provisions are ambiguous, judgment on the pleadings is improper. *See, e.g., Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir.2004); *cf. In re Turners Crossroad Dev. Co.*, 277 N.W.2d 364, 368 (Minn.1979) (stating that if contractual terms at issue are ambiguous or uncertain, summary judgment is not appropriate).

The purpose of certification is to provide answers to important and doubtful legal questions. *See Hawkins v. Thorp Credit & Thrift Co.*, 441 N.W.2d 470, 472 (Minn. 1989) (explaining that the district court "must specify the precise legal question certified and make specific findings of fact" relevant to the certified question). Certification should not be used "to secure an advisory opinion." *Rude v. Rude*, 283 Minn. 524, 525, 166 N.W.2d 719, 719 (1969) (per curiam). We consistently have declined to answer certified questions that are hypothetical or based on insufficient facts. *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 47 (Minn.1984); *see, e.g., F. & H. Inv. Co. v. Sachman–Gilliland Corp.*, 305 Minn. 155, 158, 232 N.W.2d 769, 772 (1975); *Staples v. Zinn*, 302 Minn. 149, 152–53, 223 N.W.2d 415, 417–18 (1974).

The certified question here is: "Does the filed rate doctrine bar [appellants'] claims?" In considering whether the filed rate doctrine bars appellants' claim for injunctive relief, the majority does not consider the threshold question of whether the tariff is ambiguous. Instead, the majority focuses on the standard of review for judgment on the pleadings. Construing the tariff provisions "in the light most favorable to appellants," the majority concludes that "NSP must maintain certain equipment" and, therefore, that the filed rate doctrine does not bar the claim for injunctive relief.[1]

I disagree with the analysis of the majority. At this preliminary stage of the proceedings, appellants' allegations in the complaint are only allegations. Because appellants and NSP offer different, reasonable interpretations of the tariff, I conclude that the tariff is ambiguous. In fact, in the section on primary jurisdiction, the majority agrees that the tariff is ambiguous and determines that the scope of NSP's obligations under the tariff "is best suited for a first consideration by the MPUC." As a result of the ambiguity, the

---

1. In reviewing a ruling on a motion for judgment on the pleadings, we accept appellants' *factual* allegations in the pleading as true. *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 623 (Minn.2007). We are not required to accept appellants' allegations with respect to the construction of the tariff. *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995) (but noting that courts "strive to resolve any contractual ambiguities" in favor of the nonmoving party in reviewing the dismissal of a complaint).

certified question of whether the claim for injunctive relief is barred by the filed rate doctrine is not ripe for determination by this court. I agree with the majority that the ambiguity in the tariff must first be resolved by the MPUC.

Under appellants' interpretation of the tariff, the claim for injunctive relief can go forward; under NSP's interpretation, the claim is barred by the filed rate doctrine. Consequently, the answer to the certified question depends on which of the two reasonable interpretations of the tariff will prevail. The majority attempts to sidestep this problem by assuming the allegations in the complaint are true. But appellants' allegations ask this court to assume not only that the facts of the complaint are true, but also that the proposed interpretation of the ambiguous tariff will be the one adopted by the MPUC. Essentially, appellants seek an advisory opinion on whether the claim is barred by the filed rate doctrine if the MPUC accepts appellants' proposed interpretation of the tariff. In short, the majority goes too far in answering the certified question based on appellants' allegations in the complaint. *See F. & H. Inv. Co.*, 305 Minn. at 158, 232 N.W.2d at 772 (stating that the court will not consider a certified question that " 'might result in one answer to one set of circumstances but another answer to a different set of circumstances.' " (quoting *Thompson v. State*, 284 Minn. 274, 277, 170 N.W.2d 101, 103 (1969))). Because the tariff is ambiguous, I would decline to answer the certified question and refer the interpretation of the tariff to the MPUC.

